# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

COMSYS, INC. and
KATHRYNE L. MCAULIFFE,

Case No. 16-CV-655-JPS

Plaintiffs,

v.

THE CITY OF KENOSHA WISCONSIN,
THE CITY OF KENOSHA WATER UTILITY,
FRANK PACETTI, EDWARD ST. PETER,
MERRIL A. KERKMAN, JR.,
KEITH G. BOSMAN, ERIC J. HAUGAARD,
RHONDA JENKINS, JAN MICHALSKI,
ROCCO L. LaMACCHIA, SR., DAVE PAFF,
KURT WICKLUND, KEITH W. ROSENBERG,
ANTHONY KENNEDY, SCOTT N. GORDON,
CURT WILSON, DANIEL L. PROZANSKI, JR.,
JACK ROSE and ROBERT C. JOHNSON,

ORDER

Defendants.

On June 3, 2016, Comsys, Inc. and Kathryne McAuliffe (collectively, "the plaintiffs") filed this lawsuit against The City of Kenosha, The City of Kenosha Water Utility, and seventeen (17) government officials (collectively, "the defendants") under 42 U.S.C. §§ 1983, 1985, 1986 and 1988 seeking damages to remedy various First, Fourth, and Fifth Amendment violations. (*See generally* Docket #1; *see also* Docket #31 at ¶¶ 1, 122-269 (amended complaint)). Pursuant to this Court's supplemental jurisdiction, the plaintiffs also seek damages for violations of Wisconsin law. (*See* Docket #31 at ¶¶ 4, 270 -326). The allegations underlying both the federal and state law claims concern certain information technology ("IT") service contracts that The City of Kenosha ("the City") and The City of Kenosha Water Utility ("the Water Utility") entered into with Comsys, Inc. from approximately 1987 until 2015. (Docket #31 at ¶¶ 32-42). According to the amended complaint, the events

that led up to—and ultimately culminated in—the termination of these IT service contracts involved a complex conspiracy among the various government officials that are named in this lawsuit, including the mayor, the city administrator, the general manger of the Water Utility, the City's director of IT, and thirteen (13) Alderpersons. (Docket #31 at ¶¶ 32-121).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the defendants filed a motion to dismiss the amended complaint in its entirety. (Docket #37). That motion is now fully briefed and ripe for adjudication. (Docket #38, #39, #40). For the reasons stated herein, and as more fully described below, the Court will grant the defendants' motion in part, and deny it in part.

1.      BACKGROUND

Before delving into the legal issues underlying the defendants' motion, the Court will first provide an overview of: (1) the parties to this litigation; and (2) the factual background of the case.[1]

1.1     The Parties

Comsys, Inc. ("Comsys") is a private, for-profit Wisconsin corporation based in Racine. (Docket #31 at ¶ 6). Comsys is engaged in computer facilities management throughout the southeastern section of the State. (Docket #31 at ¶ 6). Kathryne McAuliffe ("McAuliffe")—an adult female citizen who also resides in Racine—is Comsys' sole shareholder. (Docket #31 at ¶¶ 6-7).

_____

[1]This Court derives its jurisdiction over this action from 18 U.S.C. §§ 1331, 1367. (Docket #31 at ¶¶ 1, 4). For the purposes of ruling on the defendants' motion to dismiss, the Court will draw the relevant facts from the plaintiffs' amended complaint. (*See* Docket #31); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiffs' complaint."); *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1057 (7th Cir. 1998) (explaining that an "amended complaint bec[omes], upon its submission, the operative complaint in the case").

In this case, the plaintiffs are suing two municipal entities: the City and the Water Utility. (Docket #31 at ¶¶ 8-9). The City is a municipal, political subdivision of the State of Wisconsin, duly organized and operating under the laws of the State. (Docket #31 at ¶ 8). The Water Utility is likewise a municipal, political subdivision of the State of Wisconsin, duly organized and operating pursuant to Wis. Stat. § 66.068. (Docket #31 at ¶ 9).

The plaintiffs have also named as defendants:

1.   Keith G. Bosman ("Mayor Bosman")—an adult citizen and resident of the City and County of Kenosha—who at all times relevant, was elected and employed as the mayor of the City;

2.   Frank Pacetti ("Pacetti")—an adult citizen and resident of the City and County of Kenosha—who at all times relevant was employed as the city administrator for the City;

3.   Edward St. Peter ("General Manager St. Peter")—an adult citizen and resident of the City and County of Kenosha—who at all times relevant was employed as the general manager for the Water Utility;

4.   Merril A. Kerkman, Jr. ("Kerkman")—an adult citizen and resident of the County of Kenosha—who, prior to May 1, 2014, was an employee of Comsys, and, from May 1, 2014, to the present, has been employed as the City's director of IT.

(Docket #31 at ¶¶ 10-13).

Also named in this action are thirteen (13) individuals who, at all times relevant, were elected and employed as Alderpersons for the City: (1) Eric J. Hauggard; (2) Rhonda Jenkins; (3) Jan Michalski; (4) Scott N. Gordon; (5) Rocco J. LaMacchia, Sr.; (6) Dave Paff; (7) Kurt Wicklund; (8) Keith W. Rosenberg; (9) Anthony Kennedy; (10); Curt Wilson; (11) Daniel J. Prozanski,

Jr.; (12) Jack Rose; and (13) Robert C. Johnson. (Docket #31 at ¶¶ 14-26).[2] In addition to their roles as Alderpersons, Eric J. Hauggard, Rhonda Jenkins, Jan Michalski, and Scott N. Gordon also served, in various capacities, on the Board of Water Commissioners for the Water Utility. (Docket #31 at ¶¶ 14-16, 22). For the sake of clarity, the thirteen (13) Alderpersons named in this suit will be collectively referenced hereinafter as the "Alderperson defendants," and the four (4) Alderpersons who *also* served on the Board of Water Commissioners will be collectively referenced hereinafter as the "Commissioner defendants."

### 1.2    Factual Background

Though the amended complaint spans over eighty (80) pages and asserts nineteen (19) federal and state law counts against the defendants, the Court will attempt to overview only those pertinent facts to the defendants' motion. (Docket #31). Beginning in 1987, Comsys began performing IT services for the City and the Water Utility as an independent computer facilities management provider. (Docket #31 at ¶¶ 32-33). In that role, Comsys performed various functions such as furnishing professional/technical assistance in connection with IT management, information system administration, and programming support services. (Docket #31 at ¶¶ 32-33). During this working relationship, Comsys entered into various IT service contracts with both the City and the Water Utility. (Docket #31 at ¶¶ at 37-43).

---

[2] The amended complaint alleges that each of the named defendants in this case has acted under the "color of state law." (Docket #31 at ¶¶ 3, 8-26). In addition, as discussed further below (*see infra*, Part 3.1), all of the individual defendants are being sued in their individual *and* their official capacities. (Docket #31 at ¶ 30).

On or about March 8, 1988, Comsys hired Kerkman as an employee, and from January 1, 2013, until March 31, 2014, Kerkman served as the company's Chief Information Officer. (Docket #31 at ¶ 34). As an employee of Comsys, Kerkman signed a contract which governed various areas, including, but not limited to, confidentiality, trade secrets, non-disclosure, non-competition, and "corporate opportunities." (Docket #31 at ¶¶ 45-51).

At the core of this law suit, the amended complaint alleges that Kerkman and Pacetti conspired to misappropriate Comsys' goodwill, confidential information, trade secrets, and employees. (Docket #31 at ¶ 60). More specifically, the plaintiffs allege that sometime in or around July of 2013, Kerkman began soliciting Pacetti to: (1) create a director of IT position for the City; and (2) hire Kerkman to fill that role. (Docket #31 at ¶¶ 58, 60). To that end, Kerkman allegedly obtained unlawful access to Comsys' and McAuliffe's confidential and proprietary business data, personal information, and trade secrets either by unlawfully access Comsys' and McAuliffe's email accounts/archives or by modifying certain server settings to covertly route Comsys' emails to Pacetti and/or Kerkman. (*See* Docket #31 at ¶¶ 61-62).

Though the City did not formally create the director of IT position until late November or early December 2013, on September 24, 2013, Pacetti allegedly informed McAuliffe that he planned to create and offer the position to Kerkman, and that Kerkman would accept the City's offer. (Docket #31 at ¶¶ at 66, 69). Unbeknownst to the plaintiffs, during the process of creating this new, in-house IT department, Pacetti allegedly relied on information that Kerkman unlawfully obtained from the plaintiffs' confidential business and personal data and emails. (Docket #31 at ¶ 69).

In light of the City's purported creation of an in-house IT department, Pacetti informed McAuliffe that the City wanted to reduce Comsys' service

fees. (Docket #31 at ¶ 66). Ultimately, however, the parties could not agree on a modified contract price. (Docket #31 at ¶¶ 66-67).

In the spring of 2014, while the City's Deputy Police Chief, Daniel Miskinis ("Miskinis"), conducted "an administrative spot check for purposes of ensuring compliance" with Police Department e-mail "archiving" protocols, "it was discovered that archives containing e-mails of both Deputy Chief Miskinis and Chief Morrissey were being maintained on [the City's email server], contrary to protocol." (Docket #31 at ¶¶ 77, 79). As part of this investigation, the police interviewed McAuliffe on numerous occasions. (Docket #31 at ¶¶ 79, 82). Ultimately, the investigation led Miskinis to conclude that, on various occasions in 2013-2014, Kerkman had wrongfully accessed Comsys' employee emails, tax documents, and salary information. (Docket #31 at ¶¶ 80-82, 89).

When Pacetti learned of the Miskinis investigation, Pacetti asked to meet with McAuliffe, wherein he expressed disappointment with her having "initiated" the investigation. (Docket #31 at ¶ 85). Pacetti then allegedly threatened McAuliffe by telling her "it would not be good" for the plaintiffs if the Kenosha Police Department pursued the allegations of criminal conduct against Kerkman. (Docket #31 at ¶ 85). At a second meeting, the plaintiffs allege that Pacetti threatened he would terminate Comsys' IT service contracts if McAuliffe continued engaging with law enforcement on the basis of Kerkman's allegedly criminal activities. (Docket #31 at ¶ 90).

It was not until March 31, 2014, following the Miskinis investigation, that Comsys formally terminated Kerkman due to his allegedly unlawful access to McAuliffe's and other employees' email archives. (Docket #31 at ¶ 91). A few weeks later, the City formally hired Kerkman as the director of IT. (Docket #31 at ¶ 92).

On May 1, 2014, the plaintiffs filed a criminal complaint against Kerkman. (Docket #31 at ¶ 93).[3] In connection with that complaint, the Racine County Sheriff's Department executed a search warrant on the City's computer servers on May 27, 2014; this search, according to the plaintiffs, set off a chain of retaliatory acts directed towards McAuliffe and Comsys. (Docket #31 at ¶ 97). First, McAuliffe allegedly received an email from Pacetti and General Manager St. Peter stating that "[e]ffective immediately… all…Comsys system access privileges to all City of Kenosha and Kenosha Water Utility computer systems [were] temporarily disabled." (Docket #31 at ¶ 98). In addition, both Mayor Bosman and General Manager St. Peter called special meetings of the Common Council and the Board of Water Commissioners "[t]o consider the service and lease agreements between the City and COMSYS, Inc." (Docket #31 at ¶¶ 99-100). The plaintiffs further claim that Mayor Bosman and Pacetti personally contacted some of the Alderperson defendants to advocate for the termination of Comsys' contracts. (Docket #31 at ¶ 101).

On June 2, 2014—the day that the City Council and the Board of Water Commissioners were set to conduct special meetings to discuss Comsys' situation—Comsys' legal counsel emailed a letter and supporting documents to the City Attorney outlining Kerkman's and Pacetti's allegedly unlawful conspiracy to misappropriate Comsys' goodwill, confidential information, trade secrets, and employees. (Docket #31 at ¶ 104). Nonetheless, after deliberating in closed sessions, both the City and the Water Utility voted to terminate Comsys' IT service contracts. (Docket #31 at ¶¶ 104-108).

---

[3] The Kenosha Police Department has allegedly referred the complaint to the Racine County Sheriff's Department, which is actively investigating the case with the Federal Bureau of Investigation. (Docket #31 at ¶¶ 93-94).

Prior to the contracts' termination, the plaintiffs allege that Comsys had never been notified of any compliance issues; in fact, the plaintiffs allege that Comsys had even received a letter from the City Attorney praising its excellent working relationship with the City. (Docket #31 at ¶ 102). Further, the amended complaint alleges that at no time in the three years prior to the contracts' termination did the Common Council discuss, budget for, commission studies for, or otherwise formally contemplate the creation of an in-house IT Department. (Docket #31 at ¶ 103). David Bogdala—an Alderman who participated in the City's June 2, 2014, special meeting—allegedly informed the press that the call to terminate Comsys' contracts "had everything to do with [the plaintiffs' criminal] investigation." (Docket #31 at ¶ 109).

Thereafter, the plaintiffs allege that the Water Utility: (1) began to "unilaterally and improperly" shift Comsys' billed hours between itself and the City; and (2) hired two Comsys employees, in violation of their employee contracts. (Docket #31 at ¶¶ 110-117). None of the defendants have allegedly investigated Comsys' claims or, at any time, attempted to stop the termination of Comsys' contracts or disciplined Kerkman or Pacetti. (Docket #31 at ¶¶ 110-117).

As a result of the aforementioned conduct, Comsys claims to have sustained injury and damages including, but not limited to: (1) a loss of substantial business revenue and profit; (2) a loss of valuable confidential and proprietary business information and trade secrets; and (3) a material loss of business reputation and goodwill value. (Docket #31 at ¶ 119). In addition, McAuliffe claims to have been harmed by: (1) a loss of stock value in Comsys; (2) a material loss of professional reputation; and (3) severe emotional distress. (Docket #31 at ¶ 120). Further, the plaintiffs claim that the

City and the Water Utility have terminated their relationships with a woman-owned business enterprise in favor creating an all-male in-house IT department. (Docket #31 at ¶ 121). Collectively, these harms form the basis of the plaintiffs' nineteen (19) count complaint. (*See generally* Docket #31).

2.      LEGAL STANDARD

"A motion to dismiss pursuant to [Rule] 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state enough facts that, when accepted as true, 'state a claim for relief that is plausible on its face.'" *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). The Court must "tak[e] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008).

3.      ANALYSIS

The defendants argue that dismissal of the amended complaint is proper under Rule 12(b)(6) for six reasons. They argue that:

1.      The official capacity claims against individually named defendants are redundant;

2.      The doctrine of absolute legislative immunity bars all claims against the Alderperson and Water Commissioner defendants;

3. A lack of personal involvement bars the claims asserted against Mayor Bosman, General Manager St. Peter, and the Alderperson defendants;

4. The claims against the City and the Water Utility are insufficiently pled under the "final policymaker" doctrine;

5. The amended complaint fails to state First, Fourth and Fifth Amendment claims; and

6. All of the state law claims are barred because:

    a. The plaintiffs failed to comply with Wisconsin's notice of claim statute, Wis. Stat. § 893.80; and,

    b. Municipal entities may not be held liable for the intentionally tortious conduct of their employees under Wis. Stat. § 893.80(4).

(Docket #37). The Court will address each argument in turn.

### 3.1 Official Capacity Claims

The defendants argue that the Court should dismiss all of the official capacity claims asserted against the individually named defendants because they are duplicative of the same claims that are alleged against the municipalities in this action. (Docket #38 at 7). This is because "a lawsuit against a municipal official in his official capacity is equivalent to one against the municipality." (Docket #38 at 7) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)). The plaintiffs "do not dispute" the defendants' position and expressly acknowledge that an official capacity suit is construed as a suit against the municipal defendants.[4] (Docket #39 at 7; Docket #31 at ¶ 30).

_____

[4] The plaintiffs' opposition brief explains that their goal in drafting the complaint in such a manner was to put the individually named defendants on notice that they are being sued both in their individual *and* official capacities. (Docket #37 at 7; Docket #31 at ¶ 30).

"Official-capacity suits…generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky*, 473 U.S. at 165–66; *see also Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011) ("[A]n official capacity suit is another way of pleading an action against an entity of which the officer is an agent."). Based on this rule, district courts routinely dismiss official capacity claims against individuals as "redundant" where the appropriate municipality is also named. *See, e.g., Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, No. 14-CV-674, 2015 WL 7301244, at *4 (W.D. Wis. Nov. 18, 2015), *aff'd*, No. 15-3818, 2016 WL 4468085 (7th Cir. Aug. 24, 2016) ("Therefore, I will dismiss plaintiffs' § 1983 claims against the seven trustees as redundant of plaintiffs' § 1983 claim against the Village."); *Kerry M. v. Manhattan Sch. Dist. #114*, No. 03-CV-9349, 2004 WL 2538303, at *5 (N.D. Ill. Sept. 28, 2004) ("Following these cases, the Court agrees that plaintiff's claims against Dr. Fries in her official capacity are redundant and unnecessary.").

Accordingly, because the City and Water Utility are defendants in this action, the Court will dismiss all of the official capacity claims against the individually named defendants as they are both unnecessary and redundant.

### 3.2    Legislative Immunity

Next, the defendants argue that the Alderperson and Commissioner defendants should be dismissed from this case because they are absolutely immune from suit under the doctrine of legislative immunity. (Docket #38 at 7-9). In response, the plaintiffs argue that because these defendants were not acting in their "legislative capacity" when they voted to terminate Comsys'

Case 2:16-cv-00655-JPS   Filed 11/29/16   Page 11 of 35   Document 41

contracts with the City and the Water Utility the doctrine of legislative immunity is inapplicable. (Docket #39 at 8-12).

"The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998). This rule of "absolute immunity" exists to advance the "public good" by ensuring that "the exercise of legislative discretion [is] not inhibited by judicial interference or distorted by the fear of personal injury." *Id.* at 54. In light of this purpose, the Supreme Court has clarified that the "venerable tradition" of legislative immunity not only applies to federal legislators, but also protects state, local, and regional officials who are sued under Section 1983. *Id.* at 49 (explaining "that Congress did not intend the general language of § 1983 to 'impinge on a tradition so well grounded in history and reason'") (internal citations omitted).

Due to the "absolute" nature of legislative immunity, however, the doctrine only protects officials insofar as they are acting "in the sphere of legitimate legislative activity." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). In other words, "[a]bsolute immunity…only applies to those legislators acting in their legislative capacity." *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988). Government officials seeking immunity bear the burden of showing that the doctrine protects the specific conduct at issue. *Id.*

To determine whether the doctrine of legislative immunity applies, courts rely on a functional test. *See Clarke v. Abele*, No. 16-CV-208, 2016 WL 1611475, at * 3 (E.D. Wis. 2016). In other words, this Court must "first look[] at whether the acts were 'in form, quintessentially legislative.'" *Bagley v. Blagojevich*, 646 F.3d 378, 385 (7th Cir. 2011) (internal citations omitted). Under this inquiry, whether an action is formally legislative "turns on the nature of the act" and whether the act is an "integral step[] in the legislative

process," rather than on "the motive or intent of the official performing it." *Id.* at 392; *accord Rateree*, 852 F.2d at 950. Further, "courts look at whether the defendants acted pursuant to constitutional or statutory procedures." *Bagley*, 646 F.3d at 392-93 ("Without a doubt, the act of vetoing a line item in a bill constitutes an 'integral' step in Illinois's 'legislative process.' Illinois's Constitution gives the state's governor authority to exercise a line-item veto over appropriation bills.") (internal citations omitted); *see also State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 90–91 (2d Cir. 2007) (concluding that it was unclear whether the alleged actions were "integral steps in the statutory budget process") (internal citations omitted).

Second, "though *Bogan* does not explicitly require an inquiry into the action's substance," courts may also "examine the action's substance because it [may] help illuminate what actions are included 'in the sphere of legitimate legislative activity.'" *Bagley*, 646 F.3d at 392 (internal citations omitted). For this portion of the inquiry, the Court should look "at the action's character to determine whether the action substantively 'bore all the hallmarks of traditional legislation.'" *Id.* (citing *Bogan*, 523 U.S. at 55). In other words, an action will "qualif[y] as legislative in substance if it reflects 'a discretionary, policymaking decision implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents.'" *Id.* (citing *Bogan*, 523 U.S. at 55); *see also Yakus v. United States*, 321 U.S. 414, 424 (1944) ("The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct."). If, however, a legislator is performing an "administrative act" as opposed to a "legislative act," the legislator is not protected by absolute immunity. *Bagley*, 646 F.3d at 393-94.

The difference between "legislative" activity and "administrative" activity often involves fine distinctions that are difficult to decipher. *See Rateree*, 852 F.2d at 951 ("Although this line drawing is often difficult, it preserves the balance between inhibiting public officials from exercising their essential duties and protecting victims of wrongs committed by public officials."). For example, though "[i]ntroducing, voting, and signing into law a budget [are] 'formally legislative' actions.…" *Bagley*, 646 F.3d at 392 (citing *Bogan*, 523 U.S. at 55), voting on an issue, in and of itself, does not conclusively determine whether an act is legislative in nature. *See, e.g., Chicago Miracle Temple Church, Inc. v. Fox*, 901 F. Supp. 1333, 1343-44 (N.D. Ill. 1995) (concluding that a village board vote to authorize a purchase offer for property was not "legislative action" because it was not an enactment or promulgation of public policy). Recognizing this fact, the Seventh Circuit has acknowledged a "distinction between actions that involve the elimination of positions for *policy* reasons (legislative actions) and actions that result in an individual's termination for reasons that relate to *that* individual (administrative actions)." *Bagley*, 646 F.3d at 394 (emphasis added).

In this case, both parties acknowledge that the Alderperson and Commissioner defendants are named in this lawsuit as a result of their votes to terminate Comsys' IT service contracts. (Docket #31 at ¶¶ 91-201 , 222-232, 255-261). These votes were cast on June 2, 2014, by the City Council and the Board of Water Commissioners. (Docket #31 at ¶¶ 91-201 , 222-232, 255-261). Based on the limited facts before it, however, the Court cannot conclude that the defendants have satisfied their burden to show that the Alderperson and Commissioner defendants should be cloaked by legislative immunity.

In terms of whether the defendants' votes were legislative in form, it appears that the votes cast during the special meetings were made pursuant

to prescribed, statutory procedures. *See* Wis. Stat. § 62.11(2) ("More frequent regular meetings may be established by the council, and the mayor may call a special meeting…."); Wis. Stat. § 62.11(5) (during special meetings, "the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city…."). And, to be sure, "signing and vetoing bills…are 'integral steps in the legislative process.'" *Bagley*, 646 F.3d at 391 (internal citations omitted).

Nonetheless, determining whether the Alderperson and Commissioner defendants' actions were substantively legislative—*i.e.*, whether the defendants were acting in a legislative or administrative capacity at the time they cast their votes—depends on facts that have not (yet) been fully developed in this litigation. The defendants' position turns on their assertion that "the Alderperson [d]efendants voted to eliminate an outsourced IT department, *i.e.*, Comsys, in favor of creating [an] in-house IT department." (Docket #40 at 3). And, since "[t]hose votes constituted a classic discretionary, *policy*-making, decision that implicated the budgetary priorities of the City as a whole, and that affected the services the City provides to its residents," the defendants urge the Court to conclude that the doctrine of legislative immunity should apply. (Docket #40 at 3) (emphasis added).

The problem with this argument, however, is that it exclusively relies upon activities that took place *after* the Alderperson and Commissioner defendants voted to terminate the contracts. (Docket #40 at 2-3). In other words, the defendants argue that the City's creation of the director of IT position conclusively demonstrates that the Alderperson and Commissioner defendants had the enactment or promulgation of budgetary policy—rather than the potential for litigation—in mind when voting to terminate Comsys'

Case 2:16-cv-00655-JPS   Filed 11/29/16   Page 15 of 35   Document 41

contracts. (Docket #40 at 2-3). This position stands in tension with the allegations in the amended complaint, which state that: (1) the purpose of the City Council's and Board of Water Commissioners' meetings was not legislative in nature, but rather administrative (*i.e.*, to discuss legal strategies with Kenosha's legal counsel); and (2) prior to the votes in question, the City and the Water Utility had *never* contemplated the creation of an in-house IT department.[5] (Docket #39 at 10-11) (citing Docket #31 at ¶¶ 99-100, 109)*; see also Fox*, 901 F.Supp at 1342 (analyzing Supreme Court and Seventh Circuit precedent and concluding that "at its core the legislative function involves determining, formulating, and making *policy*") (emphasis added).

The exhibits submitted with the amended complaint also suggest that the defendants' votes to terminate Comsys' contracts may have been made in response to the City's and the Water Utility's fear of potential litigation with Comsys, rather than enactment an in-house IT policy. *See Fowler–Nash v. Democratic Caucus of the Pennsylvania House of Representatives*, 469 F.3d 328, 340 (3d Cir. 2006) (holding that because an employment decision "did not rely on any broad consideration of policy," was not "directed to creating a new policy," "did not reach beyond a single employee," and did not eliminate a position "thereby affecting future employees," the defendants were not acting legislatively when they terminated the plaintiff). First, the meeting notices prepared by the City and the Water Utility specifically referenced both the City's and the Water Utility's intent "to discuss litigation strategies with the City's Legal Counsel regarding issues surrounding this

---

[5]As previously noted on Page 6 of this Order, the plaintiffs allege that: (1) Comsys had never previously been notified of compliance issues; and (2) Comsys had received a letter from the City Attorney praising its excellent working relationship with the City. (Docket #31 at ¶¶ at 102-103).

action." (Docket #31, Exs. 9-10). Likewise, the recorded minutes from both special meetings confirm that as soon as the City Council and Board of Water Commissioners convened, they went into closed discussions pursuant to Wis. Stat. § 19.85(1)(g) (providing that "[a] closed session may be held [to]… confer[] with legal counsel for the governmental body who is rendering oral or written advice concerning strategy to be adopted by the body with respect to litigation in which it is or is likely to become involved"). Immediately following these closed sessions, without any discussion as to the policy or budgetary considerations, both bodies voted to terminate Comsys' contracts. (Docket #31, Exs. 12-13).

In sum, the amended complaint contains allegations that, if true, cast significant doubt on whether the Alderperson and Commissioner defendants were truly acting in a "legislative capacity" at the time they voted to terminate Comsys' IT service contracts. Due to the limited factual record before it at this juncture, the Court will deny the defendants' motion to dismiss the Alderperson and Commissioner defendants on the grounds of absolute legislative immunity.

### 3.3    Personal Involvement

Next, the defendants argue that the amended complaint fails to sufficiently plead personal involvement with respect to: (1) the Alderperson and Commissioner defendants; (2) Mayor Bosman; and (3) General Manager St. Peter.  (Docket #38 at 9-12). As such, the defendants argue these particular persons cannot be held liable under Section 1983 and should be dismissed from the action. (Docket #38 at 9-12). The Court disagrees.

"Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (internal citations omitted); *see also Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987) ("Each individual defendant can be liable only for what he or she did personally, not for any recklessness on the part of any other defendants, singly or as a group."). However, "'[a]n official satisfies the personal responsibility requirement…if the conduct causing the constitutional deprivation occurs at [his or her] direction or with [his or her] knowledge and consent.'" *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). That is, the defendants "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988) (internal citations omitted). "They must in other words act either knowingly or with deliberate, reckless indifference." *Id.*

First, with respect to the Alderperson and Commissioner defendants, the defendants argue that the mere act of voting to terminate Comsys' contracts with the City and the Water Utility is insufficient "personal involvement" in the underlying First Amendment violations to sustain liability under Section 1983. (Docket #38 at 10-11). Beyond the fact that the defendants cite to no case law in support this proposition, the problem with their broad assertion is that they ignore the context in which the Alderperson and Commissioner defendants purportedly made their decisions to terminate Comsys' contracts.

The amended complaint alleges that, prior to casting their votes, the defendants were made aware of: (1) Pacetti's and Kerkman's conspiracy; and

(2) the plaintiffs' criminal complaint/investigation in connection with that conspiracy. (Docket #31 at ¶¶ 105-106, 191-201, 222-232). The plaintiffs further allege that the votes were made for the sole purpose of retaliating against the plaintiffs' initiation of the criminal investigation into Pacetti and Kerkman. (Docket #31 at ¶¶ 105-106, 191-201, 222-232). As evidence that the Alderman and Commissioner defendants "participated" in retaliating against the plaintiffs, the plaintiffs claim that one of the City's Alderman, Alderman Bogdala, publicly abstained from voting on the Comsys contracts because the vote "had everything to do" with the plaintiffs' criminal complaint and investigation into Pacetti's and Kerkman's conspiracy. (Docket #31 at ¶ 109). Thus, the Court cannot conclude, at this juncture, that the Alderman and Commission defendants should be dismissed for a lack of personal involvement.

Second, the Court concludes that the amended complaint alleges sufficient personal involvement with respect to Mayor Bosman and General Manager St. Peter. For his part, Mayor Bosman allegedly telephoned certain Alderperson defendants in advance of the City's special meeting to discuss Comsys' contracts. (Docket #31 at ¶ 101). In these conversations, the plaintiffs allege that Bosman "push[ed]" the Alderpersons to terminate the City's Comsys' contracts. (Docket #31 at ¶¶ 99, 101, 171-178). With respect to General Manager St. Peter, the amended complaint alleges that after learning of the plaintiffs' criminal complaint and investigation into Pacetti and Kerkman, St. Peter terminated Comsys' access privileges to the City's and the

Water Utility's computers.[6] (Docket #31 at ¶ 98). And, both defendants are alleged to have: (1) called the special meetings that led to the votes on Comsys' contracts; and (2) drafted, signed, and mailed Comsys' termination letters. (Docket #31 at ¶¶ 99-100, 107-108). Given their knowledge of the plaintiffs' criminal complaint and the investigation into Pacetti and Kerkman's conspiracy, the plaintiffs have sufficiently alleged that Mayor Bosman and General Manger St. Peter participated in the violation of the plaintiffs' First Amendment rights.[7] (Docket #31 at ¶¶ 98-101, 107-108, 171-190, 202-221).

---

[6]The defendants argue that this communication was not, in fact, "sent" from General Manager St. Peter because he is merely "cc'd" on the access email. (Docket #40 at 6). However, the exhibit filed by the plaintiffs shows that both General Manager St. Peter's *and* Pacetti's names appear in the signature line of the email. (Docket #31, Ex. 8). Thus, there appears to be a factual issue regarding who actually terminated Comsys' access to the City's and the Water Utility's computers. However, as the amended complaint appears to have a good faith basis to support the assertion that General Manager St. Peter was (at least partially) responsible for this allegedly retaliatory act, the Court cannot fairly determine, at this stage, whether he should be dismissed.

[7]Again, while the defendants argue that the acts of "calling" a special session and "mailing" a contract termination letter are not sufficient personal involvement to sustain Section 1983 liability, they cite to no case to support their broad propositions. (Docket ##38 at 11; Docket #40 at 6). Absent any showing from the defendant as to why these actions—which were allegedly taken by Mayor Bosman and General Manager St. Peter—in direct response to, and in order to retaliate against, the plaintiffs' alleged exercise of free speech, the Court cannot fairly conclude that a Rule 12(b)(6) dismissal is proper. *See Cole v. Milwaukee Area Tech. Coll.*, 634 F.3d 901, 903 (7th Cir. 2011) (reiterating that when reviewing a Rule 12(b)(6) motion to dismiss, the court must "construe the…[c]omplaint in the light most favorable to Plaintiff, accepting as true all well pleaded facts and drawing all possible inferences in his favor").

### 3.4 *Monell* Claims

The plaintiffs allege two claims—Counts Three and Eight—against the City and the Water Utility under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). (Docket #31 at ¶¶ 146-150, 233-241). The defendants argue, however, that Count Three against the municipal entities must be dismissed because the plaintiffs have failed to allege that the constitutional violation at issue was "caused by a person with 'final decision policymaking authority.'"[8] (Docket #38 at 12-14; Docket #40 at 6-7) (quoting *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)). The Court agrees with the defendants and will, therefore, dismiss Count Three.

Under *Monell*, municipal liability exists only "when [the] execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. In this sense, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. "Case law recognizes three ways in which a municipality's policy can violate an individuals civil rights: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and

---

[8]In their opening brief, the defendants argued that *both* Counts Three and Eight should be dismissed. (Docket #38 at 12-14). However, as the parties agree that the plaintiffs properly allege that the City Council is the final policymaker with respect to the City, and that the allegedly wrongful conduct at issue in Count Eight was indeed committed by the City Council, the defendants do not pursue this theory of dismissal in their reply brief. (Docket #40 at 7). Rather, the defendants rely on a later argument—namely, that Count Eight should be dismissed because it fails to state an underlying First Amendment claim. *See infra*, Part 3.5.1. As such, the Court will not address the defendants' initial, and now abandoned, position with respect to Count Eight.

Case 2:16-cv-00655-JPS   Filed 11/29/16   Page 21 of 35   Document 41

well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal citations omitted) (internal quotation marks omitted).

Here, the parties agree that Count Three relies on the third theory of municipal liability described above. (Docket #38 at 12-14; Docket #39 at 15-17). In that claim, the plaintiffs allege that Pacetti, as City Administrator, was the final policymaker as it related to the monitoring, oversite, and interactions with third party vendors, including Comsys. (Docket #31 at ¶¶ 146-150). Further, the amended complaint alleges that Pacetti directed and/or authorized Kerkman to engage in unauthorized surveillance of the plaintiffs' email accounts, in violation of the Fourth Amendment. (Docket #31 at ¶¶ 146-150). In response, the defendants claim that, under Wisconsin state law and the City's ordinances, the Common Council, rather than the City Administrator, has final policymaking authority with respect to outside vendors. (Docket #38 at 13-14; Docket #40 at 6-7).

"[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original). In Wisconsin, the entity responsible for the "management and control" of the City's affairs is the City Council. *See* Wis. Stat. § 62.11(5). More specifically, pursuant to Wis. Stat. § 62.11(5) ("Powers"),

> except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing

of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means.

Wis. Stat. § 62.11(5). Moreover, under the Kenosha Code of General Ordinances, § 1.046(B), the City Administrator operates under "the direction of the Mayor and Common Council" to "administ[er] and control…the operation of the City and the coordination of its Departments and subunits…."[9]

Thus, because Pacetti, as City Administrator, operated under the "direction and control of the Mayor and Common Council," the Court concludes that he did not have final policymaking authority with respect to the conduct at issue in Count Three. The defendants' motion to dismiss Count Three will be granted.

### 3.5 First, Fourth, and Fifth Amendment Claims

Next, the defendants argue that the amended complaint fails to state First, Fourth, and Fifth Amendment claims, and, therefore, each Count corresponding to these claims should be dismissed under Rule 12(b)(6). (Docket #38 at 14-26). The defendants' theories with respect to each constitutional violation will be discussed in turn.

---

[9]In support of their argument that Pacetti retained final policymaking authority, the plaintiffs cite to Kenosha Code of General Ordinances, § 1.046(*D*). (Docket #31 at ¶ 55, Docket #39 at 16). However, subsection "D" of § 1.046 does not exist, and the plaintiffs have not provided the specific language upon which they rely. (*See* Docket #31 at ¶ 55; Docket #39 at 16). Accordingly, the Court cannot accept the plaintiffs' unsupported argument that Wisconsin law leaves final policymaking authority in the hands of the City Administrator.

### 3.5.1   First Amendment Claims

The plaintiffs assert five First Amendment claims.[10] (Docket #31 at ¶¶ 151-241). Each Count alleges that McAuliffe engaged in protected expression by: (1) participating in the Miskinis investigation; (2) filing a criminal complaint against Kerkman; and (3) objecting to Pacetti's and Kerkman's unlawful conduct in a letter to the City.[11] (Docket #31 at ¶¶ 153, 173, 183, 193, 204, 214, 224).

More specifically, Counts Four and Five against Pacetti claim he retaliated against the plaintiffs by harassing, threatening, and intimidating McAuliffe in several ways. The amended complaint claims that: (1) on March 13, 2014, Pacetti stated to McAuliffe his belief she initiated the Miskinis investigation and that it would "not be good" for her or Comsys if the police took criminal action against Kerkman; (2) the following day, Pacetti told another City official that Comsys' contract "needed to be re-examined"; (3) on March 20, 2014, Pacetti threatened McAuliffe that he would terminate Comsys' contracts if any criminal action were taken against Kerkman; (4) on May 23, 2014, Pacetti questioned McAuliffe about the whereabouts of the City's server and told her he had things to "consider" over the weekend; and (5) Pacetti and General Manager St. Peter notified McAuliffe on May 30, 2014, that "effective immediately" Comsys' system access privileges to all City

---

[10]The claims include: (1) Count Four (which McAuliffe asserts against Pacetti); (2) Count Five (which Comsys asserts against Pacetti); (3) Count Six (which McAuliffe asserts against Mayor Bosman, General Manager St. Peter, and the Alderman defendants); (4) Count Seven (which Comsys asserts against Mayor Bosman, General Manager St. Peter, and the Alderman defendants); and (5) Count Eight (the plaintiffs' *Monell* claim).

[11]The defendants do not contest that these activities constitute protected speech. (Docket #39).

computer systems was temporarily disabled. (Docket #31 at ¶¶ 85, 86, 90, 96, 98, 154, 164).

With respect to Counts Six and Seven, the plaintiffs claim that Mayor Bosman retaliated against the plaintiffs by: (1) calling a special City Council meeting with the intent to terminate Comsys' contract with the City; (2) contacting certain Alderpersons in advance of the special meeting to "push" for the contract's termination; and (3) actually terminating the City's contract with Comsys. (Docket #31 at ¶¶ 174, 205). Similarly, as against General Manager St. Peter, the plaintiffs claim that he allegedly retaliated by calling a special meeting for the Water Utility with the intent to terminate Comsys' contract and by actually terminating the contract. (Docket #31 at ¶¶ 184, 215). General Manager St. Peter's signature also appeared on the email in which Comsys' access to the City's computer systems was disabled. (Docket #31 at ¶ 98). Finally, with respect to the Alderman defendants, the plaintiffs claim that they allegedly retaliated against the plaintiffs by authorizing the City's termination of Comsys' IT contract. (Docket #31 at ¶¶ 194-195, 225-226).

"As a general rule, to prevail on [a First Amendment] retaliation claim, [a plaintiff] must demonstrate that '(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action.'" *Novoselsky v. Brown*, 822 F.3d 342, 354 (7th Cir. 2016) (internal citations omitted). Though "merely alleging the ultimate fact of retaliation is insufficient," *Bridges v. Parke*, 191 F.3d 455 (7th Cir. 1999) (citing *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988)), courts must bear in mind that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different

reasons, would have been proper," *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012).

Further, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.…" *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). In this sense, "a government may not condition the availability of a public benefit on the relinquishment of rights guaranteed by the first amendment." *Libertarian Party of Indiana v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984).

Here, the Court finds that Counts Four, Five, Six, Seven, and Eight allege sufficient facts to withstand the defendants' motion to dismiss. The facts and circumstances outlined above demonstrate that Pacetti, Mayor Bosman, General Manager St. Peter, and the Alderman defendants allegedly engaged in a pattern of conduct—beginning in July of 2013 and continuing

(at least) through June 2, 2014[12]—that targeted Comsys' contracts, at least in part, on the basis of McAuliffe's: (1) cooperation with the Miskinis investigation; and/or (2) filing of a criminal complaint against Kerkman. (Docket #31 at ¶¶ 85, 86, 90, 96, 98, 154, 164, 174, 194-195, 205, 225-226). Though the defendants are correct that Pacetti, as City Administrator, had the "right…to debate the merits of" Comsys' contracts (Docket #38 at 22-23), nonetheless, Pacetti's purported threats to terminate Comsys' contracts in retaliation for McAuliffe interactions with law enforcement may indeed be actionable under the First Amendment. *See Novoselsky*, 822 F.3d at 356 (reiterating that "[r]etaliatory speech" may be "actionable…in situations of 'threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action w[ill] immediately follow'") (internal citations omitted); *see also Kole v. Vill. of Norridge*, 941 F. Supp. 2d 933, 946 (N.D. Ill. 2013)

---

[12]The defendants argue that any "retaliatory" conduct that took place *prior* to McAuliffe's protected speech is not actionable under the First Amendment. (Docket #38 at 23-24). Indeed, the Court agrees that any activity that taking place before the alleged impetus for retaliation occurred could not have "motivated" the retaliation. *See Novoselsky*, 822 F.3d at 354. Nonetheless, the Court cannot agree that the defendants' argument warrants the dismissal of any claim in the amended complaint. Here, the plaintiffs allege that Pacetti threatened Comsys' contracts *after* the Miskinis investigation began in February of 2014. (Docket #31 at ¶¶ 62, 85-86, 90, 96, 98). Likewise, the amended complaint alleges that *after* McAuliffe filed a criminal complaint against Kerkman on May 1, 2014: (1) Pacetti and General Manager St. Peter disabled Comsys' access to the City's computer systems; (2) General Manager St. Peter and Mayor Bosman called special meetings with the City Counsel and the Board of Water Commissioners, respectively, with the intent to terminate Comsys' contracts; (3) Mayor Bosman contacted Alderpersons to encourage them to cut off dealings with Comsys; and (4) the Alderperson and Commissioner defendants authorized the termination of Comsys' contracts. (Docket #31 at ¶¶ 85, 86, 90, 96, 98, 154, 164, 174, 194-195, 205, 225-226). Because these actions were purportedly taken in response to, and retaliation for, McAuliffe's engagement with law enforcement, the Court cannot conclude that the plaintiffs fail to state First Amendment claims against the defendants.

(concluding that where the complaint states a plausible First Amendment claim under the unconstitutional conditions doctrine, the better course is to proceed to discovery, after which point "the parties remain free to dispute the applicability of the…doctrine").

Likewise, though Pacetti, Mayor Bosman, and General Manager St. Peter did not have the authority to terminate Comsys' contracts, the amended complaint does not tie their liability to "voting" for the contracts' termination. Rather, as outlined above, each of these defendants purportedly engaged in retaliatory conduct—either by threatening, damaging, or otherwise undermining Comsys' relationships with the City and the Water Utility—in response to McAuliffe's engagement with law enforcement (whether through the Miskinis investigation, filing a criminal complaint, or writing a letter complaining of Kerkman's conduct).[13] *(See supra,* Part 3.5.1 n.12).

In sum, based on the face of the amended complaint, the Court concludes that the plaintiffs' Counts Four, Five, Six, Seven, and Eight state plausible claims for retaliation under the First Amendment, and, therefore, the defendants' motion to dismiss these counts will be denied.

---

[13]The defendants also argue that the amended complaint fails to sufficiently allege that their actions would "likely deter the exercise of First Amendment rights." (Docket #38 at 24). In support of this theory, the defendants point to the fact that McAuliffe was still able to file a criminal complaint in May of 2014 without restriction. (Docket #38 at 24-25). This argument obfuscates the potential that retaliatory government conduct might not necessarily inhibit, but indeed may "chill," protected speech. *See Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006) (acknowledging that "[g]overnment retaliation tends to chill an individual's exercise of his First Amendment rights"). Thus, while further factual development as to this element of the plaintiffs' retaliation claims may be necessary, it is sufficiently pled. (Docket #31 at ¶¶ 156, 166, 176, 186, 197, 207, 217).

### 3.5.2    Fourth Amendment Claims

In Counts One and Two of the amended complaint, the plaintiffs claim that Pacetti and Kerkman conspired to unlawfully search the plaintiffs' email archives in violation of the Fourth Amendment.[14] (Docket #31 at ¶¶ 122-145). With respect to these Fourth Amendment claims, the defendants argue that: (1) Counts One and Two fail because the conduct underlying the claims relates to private action, rather than governmental action, as required by the Fourth amendment; and (2) even if the searches at issue are considered government action, any purported searches conducted by Pacetti and/or Kerkman were "reasonable" under the Fourth Amendment. (Docket #38 at 14-21). Because both of the defendants' fact-intensive arguments cannot be resolved at this juncture of litigation, the Court will deny the defendants' motion to dismiss Counts One and Two.

With respect to the defendants' first argument, it is indeed true that "[l]ong-established precedent holds that the Fourth Amendment does not apply to private searches." *Rann v. Atchison*, 689 F.3d 832, 836 (7th Cir. 2012). Thus, the Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of a government official.'" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (internal citations omitted). "When determining whether a private citizen has acted as a government agent, the question is whether in light of all the circumstances of the case [the person] must be regarded as having acted as an instrument or agent of the state…." *United States v. Hall*, 142 F.3d 988, 993

_____

[14]As the Court has concluded that Count Three should be dismissed, it will exclude that claim from the analysis herein.

Case 2:16-cv-00655-JPS   Filed 11/29/16   Page 29 of 35   Document 41

(7th Cir. 1998) (internal citations omitted). This inquiry focuses on whether: (1) "the government knew of and acquiesced in the intrusive conduct"; (2) "the private party's purpose in conducting the search was to assist law enforcement"; and (3) "the government requested the action or offered the private actor a reward." *United States v. Crowley*, 285 F.3d 553, 558 (7th Cir. 2002).

The Court finds that the amended complaint sufficiently alleges government action. While the defendants' brief focuses almost exclusively on the second prong of the "agent or instrument" test (namely, "whether the private party's purpose in conducting the search was to assist law enforcement," *Crowley*, 285 F.3d at 558), the amended complaint sufficiently details facts that Pacetti either: (1) "knew of and acquiesced" in Kerkman's conduct; or (2) "requested" or "offered" Kerkman a reward for the wrongful searches. (Docket #31 at ¶¶ 61-63, 75-89). As outlined above, *see supra* Part 1.2, the plaintiffs allege that sometime in or around July of 2013, Kerkman began soliciting Pacetti to: (1) create a Director of IT position for the City; and (2) hire Kerkman to fill that position. (Docket #31 at ¶¶ 58, 60). And, to that end, Kerkman and Pacetti allegedly conspired to have Kerkman obtain unlawful access to Comsys' and McAuliffe's confidential and proprietary business and personal information and trade secrets either by unlawfully access Comsys' and McAuliffe's email accounts and archives or by modifying server settings to covertly route Comsys' emails to Pacetti and/or Kerkman. (Docket #31 at ¶¶ 61-62). The amended complaint details numerous factual circumstances that purportedly evidence this alleged conspiracy. (Docket #31 at ¶ 62) (claiming that: (1) Pacetti discovered private information that would not be known without a search of the plaintiffs' property; (2) both McAuliffe and Miskinis found direct evidence of Kerkman's unlawful searches; (3)

Pacetti attempted to shield Kerkman from liability for unlawfully searching the plaintiffs' computers; and (4) Pacetti played a substantial role in placing Kerkman in the position of the City's director of IT as payback for his "espionage"). Because a conspiracy need only be alleged generally, *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006), the Court finds that the amended complaint plausibly alleges that Kerkman acted as Pacetti's "agent" in conducting the wrongful searches of the plaintiffs' property during the time period in question.

Second, the defendants argue that, even if Kerkman could be considered the government's agent/instrument, the alleged searches were "reasonable" because the plaintiffs did not have an "expectation of privacy" in the archived emails/servers at issue. (Docket #38 at 19-20). However, the Court cannot fairly conclude from the face of the amended complaint that the alleged searches conducted by Kerkman and/or Pacetti were "reasonable" under the Fourth Amendment. *See Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005) ("The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest."). Moreover, "[a] search within the meaning of the Fourth Amendment occurs only when 'a reasonable expectation of privacy' exists, and a defendant who objects to a search bears the burden of demonstrating that a reasonable expectation of privacy was violated by the search." *See also United States v. Williams*, 15 F. Supp. 3d 821, 826 (N.D. Ill. 2014) (internal citations omitted). As the defendants acknowledge, the "inquiry into whether a[n] [individual's] expectation of privacy was reasonable is necessarily fact dependent, *see United States v. Smith*, 978 F.2d

171, 180 (5th Cir. 1992), and 'whether a legitimate expectation of privacy exists in a particular place or thing' must be determined on a case-by-case basis, *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005)." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007).

Though the defendants argue that the plaintiffs could not have an objectively reasonable expectation of privacy in *the City's* email server and/or email archives (because that hardware/system was owned by the City, as opposed to Comsys), the defendants' argument misconstrues the allegations in the amended complaint. In this action, the plaintiffs' claim that Pacetti and Kerkman conspired to search and surveille *the plaintiffs'* proprietary and confidential communications and archives for the purpose of misappropriating Comsys' business assets. (Docket #31 at ¶¶ 61-62). The defendants do not argue that the plaintiffs did not maintain a reasonable expectation of privacy in their own personal and business communication archives, and, as such, the Court will deny the defendants' motion to dismiss the plaintiffs' Fourth Amendment claims.

### 3.5.3   Fifth Amendment Claim

In Count Eleven, the plaintiffs claim that the City and the Water Utility violated Comsys' Fifth Amendment rights by, among other things: (1) misappropriating Comsys' confidential and proprietary business communications, information, and trade secrets; (2) threatening to terminate Comsys' contracts if criminal action were initiated against Kerkman; and (3) interfering with Comsys' business and employment contracts. (Docket #31 at ¶¶ 262-269). With respect to the plaintiffs' Fifth Amendment claim, the defendants argue that dismissal is proper because the plaintiffs' claim is unripe under the doctrine announced in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 173 (1985) (holding that "[i]f a state

provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation clause until it has used the procedure and has been denied compensation").

Nonetheless, as the plaintiffs outline in their opposition brief, in Wisconsin, intentional tort claims cannot be asserted against municipal entities such as the City and the Water Utility. (Docket #39 at 28-29) (citing Wis. Stat. § 893.80(4)). Thus, because the *Williamson County* doctrine only applies where state law remedies would be "available" to provide "just compensation" for the alleged takings, *SGB Fin. Servs., Inc. v. Consol. City of Indianapolis-Marion Cty., Ind.*, 235 F.3d 1036, 1038 (7th Cir. 2000), the Court must deny the defendants' motion to dismiss Count Eleven.

### 3.6    State Law Claims

Finally, the defendants argue that the plaintiffs' state law claims (Counts Twelve through Nineteen) must be dismissed because: (1) the plaintiffs failed to file timely notices of claim with the City and the Water Utility as required under Wis. Stat. § 893.80(1d)(a); and (2) any intentional tort claims asserted against the City and the Water Utility should be dismissed because municipalities cannot be sued for intentionally tortious conduct pursuant to Wis. Stat. § 893.80(4).[15] (Docket #38 at 27-29).

With regard to the plaintiffs' compliance with Wisconsin's notice of claim statute, Wis. Stat. § 893.80(1d)(a), Federal Rule of Civil Procedure 9(c)

---

[15]The defendants also argue that the Court should exercise its discretion to decline supplemental jurisdiction over the remaining state law claims because all of the plaintiffs' federal claims should be dismissed for the reasons outlined above. (Docket #38 at 27). However, because the Court concludes that dismissal of the plaintiffs' First, Fourth, and Fifth Amendment claims is improper at this juncture, the Court will continue to exercise its jurisdiction over the state law claims under 28 U.S.C. § 1367.

provides that "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." Consistent with this rule, the plaintiffs allege that all conditions precedent have been performed or otherwise occurred, including the plaintiffs' provisions of notices of claim pursuant to Wis. Stat. §893.80. (Docket #31 at ¶ 5). Given this allegation, the Court concludes that the notice requirements of Wis. Stat. § 893.80 have been sufficiently pled.

Next, while the Court agrees that the City and the Water Utility may not be sued for intentionally tortious conduct under Wis. Stat. § 893.80(4), the defendants fail to direct the Court to which claims in the amended complaint their argument refers. (Docket #38 at 29). Based on the face of the amended complaint, it appears that all of the intentional tort claims alleged by the plaintiffs are against Pacetti and/or Kerkman as individuals. (Docket #31 at ¶¶ 270-326). Thus, the defendants' argument is inapplicable.

Therefore, as: (1) the plaintiffs have complied with federal pleading requirements insofar as they relate to Wisconsin's notice of claim statute; and (2) there are no intentional tort claims against the City and the Water Utility to dismiss, the Court will deny the defendants' motion to dismiss the plaintiffs' remaining state law claims.

4.    CONCLUSION

For the reasons stated above, the Court concludes that the defendants' motion to dismiss the amended complaint should be granted in part and denied in part. (Docket #37). More precisely, the Court will grant the defendants' motion with respect to: (1) the official capacity claims that are alleged against the individually named defendants; and (2) the plaintiffs' *Monell* claim alleged in Count Three. However, the Court concludes that the amended complaint pleads plausible First, Fourth, and Fifth Amendment

claims. Likewise, the plaintiffs' have sufficiently pled compliance with Wisconsin's notice of claim statute, and, as such, the Court will continue exercise its supplemental jurisdiction over the plaintiffs' state law claims.

Accordingly,

IT IS ORDERED that the defendants' motion to dismiss (Docket #37) be and the same is hereby GRANTED insofar as it relates to: (1) the official capacity claims asserted against the individually named defendants; and (2) Count Three; and DENIED insofar at it relates to all remaining counts.

Dated at Milwaukee, Wisconsin, this 29th day of November, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge