# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

COMSYS INC. AND KATHRYNE L.
MCAULIFFE,

                        Plaintiffs,

v.                                                    Case No. 16-CV-655-JPS

CITY OF KENOSHA, WISCONSIN,
CITY OF KENOSHA WATER
UTILITY, FRANK PACETTI,
EDWARD ST. PETER, MERRIL A.
KERKMAN, JR., KEITH G. BOSMAN,
ERIC J. HAUGAARD, RHONDA
JENKINS, JAN MICHALSKI, ROCCO              **ORDER**
L. LAMACCHIA, SR., DAVE PAFF,
KURT WICKLUND, KEITH W.
ROSENBERG, ANTHONY
KENNEDY, SCOTT N. GORDON,
CURT WILSON, DANIEL L.
PROZANSKI, JR., JACK ROSE, and
ROBERT C. JOHNSON,

                        Defendants.


## 1.      INTRODUCTION

        This litigation arises from the termination by the City of Kenosha (the

"City") and the Kenosha Water Utility (the "Water Utility") of their contracts

with an outside information technology vendor, Comsys Inc. ("Comsys"), a

private, for-profit Wisconsin corporation based in Racine. Comsys and

Kathryne McAuliffe ("McAuliffe"), Comsys' sole shareholder, bring a litany

of claims against the City and the Water Utility, as well as many individual

defendants: Keith Bosman ("Mayor Bosman"), who at all times relevant, was

elected and employed as the City's mayor; Frank Pacetti ("Pacetti"), who at

all times relevant was employed as the City administrator; Edward St. Peter ("St. Peter"), who at all times relevant was employed as the general manager for the Water Utility; Merril A. Kerkman, Jr. ("Kerkman"), who, prior to May 1, 2014, was an employee of Comsys, and, since May 1, 2014, has been employed as the City's Director of information technology ("IT").

The plaintiffs also named in this action thirteen individuals who, at all times relevant, were elected and employed as Alderpersons for the City (the "Alderperson defendants"): (1) Eric J. Haugaard; (2) Rhonda Jenkins; (3) Jan Michalski; (4) Scott N. Gordon; (5) Rocco L. LaMacchia, Sr.; (6) Dave Paff; (7) Kurt Wicklund; (8) Keith W. Rosenberg; (9) Anthony Kennedy; (10); Curt Wilson; (11) Daniel L. Prozanski, Jr.; (12) Jack Rose; and (13) Robert C. Johnson. (Docket #31 at ¶¶ 14–26). In addition to their roles as Alderpersons, Eric J. Haugaard, Rhonda Jenkins, Jan Michalski, and Scott N. Gordon also served, in various capacities, on the Board of Water Commissioners for the Water Utility.

The plaintiffs bring claims under 42 U.S.C. §§ 1983, 1985, and 1986 seeking damages to remedy various First, Fourth, and Fifth Amendment violations. *See generally* (Docket #1); *see also* (Docket #31 ¶¶ 1, 122–269 (Amended Complaint)). Pursuant to this Court's supplemental jurisdiction, the plaintiffs also seek damages for violations of Wisconsin law. *See* (Docket # 31 ¶¶ 4, 270–326). The allegations underlying both the federal and state law claims concern certain IT service contracts that the City and the Water Utility entered into with Comsys from approximately 1987 until 2015 (the "Comsys Contracts"). *Id.* ¶¶ 32–42. The plaintiffs claim that the events leading up to— and ultimately culminating in—the termination of the Comsys Contracts involved a complex conspiracy among the various government officials who are named in this lawsuit, including the mayor, the City administrator, the

general manager of the Water Utility, and the city alderpersons. *Id.* ¶¶ 32–121.

The defendants previously brought a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), pursuant to which the Court dismissed one count of the Amended Complaint (a *Monell* claim against the City and Water Utility for Fourth Amendment violations) as well as the plaintiffs' official capacity claims asserted against the individually named defendants. (Docket #41).

Pursuant to Federal Rule of Civil Procedure 56, the defendants filed a motion for summary judgment as to all of plaintiffs' remaining claims. (Docket #57). That motion is now fully briefed and ripe for adjudication. (Docket #70, #76, #84). For the reasons stated herein, and as more fully described below, the Court will grant the defendants' motion in part and deny it in part.

## 2. STANDARD OF REVIEW

When a party files a motion for summary judgment, it is her "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz. Lender LLC v. Nat. Ret. Fund,* 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, to demonstrate a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, the non-moving party

"must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where. . .the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz.,* 778 F.3d at 601. A court considering a motion for summary judgment must draw all reasonable inferences from the materials before it in favor of the non-moving party. *See Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir. 1989). A court will deny a motion for summary judgment when "one or more material facts are disputed or. . . the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Hotel 71 Mezz.,* 778 F.3d at 602.

## 3.    RELEVANT FACTS

Consistent with the standard of review, the following facts are taken from the evidence when viewed in a light most favorable to the plaintiffs:

Beginning in the late 1980s, Comsys began performing IT services for the City and the Water Utility as an independent computer facilities management provider. In that role, Comsys performed various functions such as furnishing professional and technical assistance in connection with IT management, information system administration, and programming support services. Comsys had contracts with the City and the Water Utility, each of which were amended over time. (Docket #77 at 5). Kerkman was a longtime employee of Comsys, and from January 1, 2013 until March 31, 2014, he served as the company's Chief Information Officer. *Id.*

The Amended Complaint alleges an elaborate conspiracy between Pacetti, the city administrator, and Kerkman, his mole, to misappropriate

Comsys' goodwill, confidential information, trade secrets, and employees so that the City could create its own IT department. More specifically, the plaintiffs allege that sometime around July 2013, Kerkman buddied up to Pacetti, soliciting him to create a Director of IT position for the City and hire Kerkman to fill that role. To that end, the plaintiffs claim that Kerkman unlawfully obtained access to Comsys' and McAuliffe's confidential data by unlawfully surveilling Comsys' and McAuliffe's email accounts and archives, and then passed that information along to Pacetti for his use in building an in-house IT department for the City.

Kerkman's and Pacetti's conspiracy was confronted with a hiccup in February 2014, the plaintiffs claim, when Deputy Chief Daniel Miskinis ("Miskinis") of the Kenosha Police Department began an administrative investigation to determine whether Kerkman had complied with a 2009 directive not to archive City Police Department emails on the City's computer server. *Id.* at 17. On March 7, 2014, Miskinis met with McAuliffe to question her (and another Comsys employee) in connection with his investigation into Kerkman. McAuliffe gave true and accurate responses to Miskinis' questions and performed actions on the City's server at his direction.

Miskinis met with McAuliffe again a couple of days later, and during that interview, McAuliffe told Miskinis about a 2013 meeting between Kerkman and Pacetti where the two men discussed the police department emails being archived on the City's server. She also told Miskinis that she had reason to believe Kerkman had accessed her email account without authorization because in the fall of the previous year, McAuliffe discovered a confidential email printed from her archives on Kerkman's desk. *Id.* at 10-11.

Around this time, Pacetti requested a meeting with the Police Chief and Miskinis, wherein he expressed disagreement with Miskinis' findings in

the Kerkman investigation at that point. *Id.* at 19. Pacetti also summoned McAuliffe to his office, and during the meeting, according to McAuliffe, Pacetti yelled at her and banged his fist on the desk, accusing her of initiating the Kerkman investigation and threatening wholesale changes to the IT department, leaving McAuliffe in tears. *Id.* at 20. Shortly afterward, McAuliffe spoke with Kenosha Joint Services Director Thomas Genthner who informed her that Pacetti asked him for copies of Comsys' contract that day and said the relationship between Joint Services and Comsys needed to be re-examined. *Id.* The next day, Kerkman told McAuliffe he was ill and went on indefinite sick leave. *Id.* He was hired by the City as its Director of IT on May 1, 2014. (Docket #78 at 37).

Sometime between March 17 – March 19, 2014, Pacetti again met with Miskinis, expressed agitation with Miskinis' continued investigation, and requested that Miskinis provide him with advance notice prior to Kerkman's arrest, which Miskinis declined. (Docket #77 at 20-21). Pacetti told Miskinis that Kerkman had "done some things that he was not proud of[,]" but nonetheless told Miskinis that if Kerkman was found guilty of the charges "there would be wholesale changes in IT." *Id.* at 21. Pacetti also called another meeting with McAuliffe, wherein he threatened termination of the Comsys contract if an adverse result occurred for Kerkman pursuant to the investigation. *Id.*

Miskinis concluded from his investigation that Kerkman had not complied with the 2009 directive, had accessed Comsys employee emails without consent, and had improperly deleted public records, among other misconduct. *Id.* at 17-18. As a result, Miskinis recommended that Kerkman be investigated for possible criminal computer crimes and that Kerkman's

administrative access to the City's and police department's networks be suspended. *Id.*

On May 1, 2014, McAuliffe filed a criminal complaint against Kerkman with the Kenosha County Sheriff's Department accusing him of surveilling her email without authorization or consent. The complaint was transferred to the Racine County Sheriff's Department, and McAuliffe met with a Racine County detective shortly thereafter and told the detective about Pacetti's threats. (Docket #77 at 23, #81 at 16-17). On May 27, 2014, the Racine County Sheriff's Department executed a search warrant on the City, taking, among other things, the City's email server. (Docket #77 at 24).

On May 30, 2014, Mayor Bosman, at the urging of Pacetti and the City Attorney, scheduled a meeting of the Common Council to take place June 2 "[t]o consider the service and lease agreements between the City and COMSYS, Inc." *Id.* at 25. The agenda for this special meeting of Common Council session stated that the Common Council may go into closed session to "discuss litigation strategies with the City's Legal Counsel regarding issues surrounding this action." *Id.* Similarly, on the same day, St. Peter called a meeting of the Board of Water Commissioners to take place on June 2 "[t]o consider the Management Information System Agreement, including First Amendment, by and between the City of Kenosha Water Utility, a Wisconsin Water Utility, and COMSYS, Inc., a Wisconsin Corporation." *Id.* The agenda for the Water Commissioners meeting also stated that the Board may go into closed session to discuss litigation strategies. *Id.*

Late in the day on May 30, 2014, McAuliffe received emails from Pacetti and St. Peter informing her that Comsys access to all City and Water Utility computer systems had been temporarily disabled because, according to St. Peter in his deposition, McAuliffe was "putting the city in a bad light"

by "[s]aying that there were illegal things going on, inappropriate things going on." *Id.* at 26.

On June 2, 2014, prior to the special meetings of the Common Council and Board of Water Commissioners, McAuliffe emailed all Alderpersons with (1) a copy of a letter sent by Comsys' attorney to the City Attorney outlining Kerkman's and Pacetti's dubious conduct over the prior year, (2) a copy of the job posting for the City's Director of IT position, and (3) a full copy of Miskinis' investigative report. *Id.* at 26-27. Most of the Alderpersons testified that they saw and read the letter attached to McAuliffe's email prior to the meeting that day. *Id.* at 27.

At the June 2 meeting, the Common Council, along with Pacetti, St. Peter, the City Attorney, and Mayor Bosman, went into closed session. *Id.* at 28-29. When they moved back into open session, the Common Council voted to terminate the City's contract with Comsys. *Id.* at 29. After the meeting of the Common Council, the Board of Water Commissioners held its meeting, and voted to terminate the Water Utility contract with Comsys. *Id.* at 32. After the meetings, Alderman Bogdala gave interviews to news media outlets where he said that the termination of the Comsys contracts was premised upon the criminal investigation into Kerkman. *Id.* at 32-33.

On June 4, 2014, McAuliffe received a letter signed by Mayor Bosman providing notice of the City's intent to terminate the its contract and a letter signed by St. Peter providing similar notice on behalf of the Water Utility. *Id.* at 32. Both contacts would terminate a year later. *Id.* In November 2014, as part of the 2015 budget, the City and the Water Utility added a total of six IT positions, of which five were filled by former Comsys employees. *Id.* at 33.

4.      ANALYSIS

    4.1      Overview

    The Court will first analyze the plaintiffs' federal claims, which include: (1) First Amendment retaliation under Section 1983 against Pacetti, Mayor Bosman, St. Peter, the Alderperson defendants, the City, and the Water Utility; (2) Fourth Amendment conspiracy under Section 1983 against Pacetti and Kerkman; (3) civil conspiracy under Section 1985(3); (4) failure to protect under Section 1986; and (5) unlawful taking under the Fifth Amendment. After addressing the plaintiffs' federal claims—and the defendants' defenses thereto—the Court will turn to the plaintiffs' state law claims, which include: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; (3) conversion; (4) extortion; (5) intimidation of a victim; (6) injury to business under Wisconsin Statutes section 134.01; (7) intentional infliction of emotional distress; and (8) tortious interference.

    4.2      Federal Claims

    The Court will first address the Alderperson defendants' contention that they are entitled to legislative immunity for the claims alleged against them. The Court will then consider whether summary judgment is appropriate on the substantive claims and, for each federal claim that survives, whether the defendants against whom those claims are alleged are entitled to qualified immunity.

    4.3      Legislative Immunity

    It is well established that government officials—including local legislators—are entitled to absolute immunity from civil liability for their legislative activities. *See Bogan v. Scott–Harris,* 523 U.S. 44, 55 (1998); *Tenney v. Brandhove,* 341 U.S. 367, 377 (1951); *Reed v. Village of Shorewood,* 704 F.2d 943, 952-53 (7th Cir. 1983). Absolute legislative immunity exists to advance the

public good by ensuring that "the exercise of legislative discretion [is] not inhibited by judicial interference or distorted by the fear of personal injury," and extends even to officials outside of the legislative branch "when they perform legislative functions[.]" *Bogan*, 523 U.S. at 54. Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity." *Id.*

To determine whether the challenged conduct falls within this protected sphere, the Court's first task is to "look[] at whether the acts were 'in form, quintessentially legislative.'" *Bagley v. Blagojevich*, 646 F.3d 378, 385 (7th Cir. 2011) (quoting *Bogan,* 523 U.S. at 54). An act is legislative in form if it was done pursuant to constitutional or statutory procedures. *Id.* at 392–93 ("Without a doubt, the act of vetoing a line item in a bill constitutes an 'integral' step in Illinois's 'legislative process.' Illinois's Constitution gives the state's governor authority to exercise a line-item veto over appropriation bills."); *see also Gallas v. Supreme Ct. of Pa.*, 211 F.3d 760, 774 (3d Cir. 2000) ("In addition, the act must be 'procedurally' legislative, that is, passed by means of established legislative procedures.") (internal citations omitted). In other words, the court examines whether the alleged actions were "integral steps in the legislative process." *Bogan*, 523 U.S. at 55.

Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it, for "[t]he privilege of absolute immunity 'would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'" *Id.* at 54 (quoting *Tenney*, 341 U.S. at 377). The Seventh Circuit has explained that the "recourse in dealing with legislators

who hide behind their shield of immunity and vote 'improperly' is, of course, a resort to the ballot box." *Rateree v. Rockett*, 852 F.2d 946, 951 (7th Cir. 1988).

Next, although "not mandatory, courts may also look beyond the government officials' 'formal actions to consider whether the ordinance was legislative in *substance*.'" *Bagley*, 646 F.3d 378, 385 (7th Cir. 2011) (quoting *Bogan*, 523 U.S. at 55.) To determine the substantive character of the action, courts look "at the action's character to determine whether the action substantively 'bore all the hallmarks of traditional legislation.'" *Id.* at 392–93 (quoting *Bogan*, 523 U.S. at 55). In other words, an action will "qualif[y] as legislative in substance if it reflects 'a discretionary, policymaking decision implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents.'" *Id*. (quoting *Bogan*, 523 U.S. at 55).

The plaintiffs' primary opposition to legislative immunity in this case is that the Alderperson defendants' action was meant solely to terminate Comsys' and McAuliffe's employment with the City. Under Seventh Circuit precedent, legislative immunity claims are not successful when the action relates to the firing of a specific individual rather than the elimination of positions. *Id.* at 393. The decision to eliminate a position is "unlike the hiring or firing of a particular employee" because eliminating positions "may have prospective implications that reach well beyond the particular occupant of the office." *Bogan*, 523 U.S. at 56. Eliminating positions reflects "a discretionary, policymaking decision implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents." *Id.* at 55–56. This is true even when the facts suggest an improper motive, because a "claim of unworthy purpose does not destroy the privilege." *Tenney*, 341 U.S. at 377.

The question in this case, then, is whether, stripped of all considerations of intent and motive, the Alderperson defendants' actions were legislative in nature. The Court concludes they were, and therefore the Alderpersons are protected by legislative immunity.

First, with regard to whether the votes of the Common Council and Board of Water Commissioners to terminate the Comsys contracts was legislative "in form," there is no dispute that Mayor Bosman and St. Peter called the special meetings of the Common Council and the Board of Water Commissioners, respectively, according to their authority to schedule and set agenda items for such meetings. *See* (Docket #77 at 25). The agenda for each meeting outlined the meeting's purpose and provided the statutory authority allowing for the groups to meet in closed session. *Id.* Although the plaintiffs point out that special meetings of the Common Council are not commonly called by the City, they do not dispute the legal authority to call such meetings. *Id.* at 26. After the closed-session portions of their meetings, the Common Council and the Board of Water Commissioners moved back into open session and voted in favor of authorizing the City and Water Utility, respectively, to terminate their contracts with Comsys. *Id.* at 29, 32.

The defendants who claim legislative immunity—the Alderperson defendants—performed exactly the function with which they were tasked: voting on matters that come before them as members of governing bodies. The facts here mirror those in *Rateree*, where the Seventh Circuit found that a city council vote approving a budget ordinance, which resulted in the elimination of certain positions, was a legislative act cloaking the city commissioners in absolute immunity despite the plaintiffs' contention that their separation from city employment was done in retaliation for their political affiliations. *Rateree*, 852 F.2d at 947–48.

In addition, the Common Council and Board of Water Commissioner votes were substantively legislative because they reflected the Council's and Board's "discretionary, policymaking decision" which, in turn, "'implicat[ed] the budgetary priorities of the [city government] and the services the [city government] provides to its constituents.'" *Bagley*, 646 F.3d at 395 (quoting *Bogan*, 523 U.S. at 55). The decision to eliminate an outside vendor and instead bring those services in-house affects the City budget at large, and thus its "implications reach[] well beyond" the plaintiffs. *Bogan*, 523 U.S. at 56. The votes were, in all material respects, the same as the activity challenged in *Bogan*, wherein the Supreme Court held that the act of voting for an ordinance, which eliminated the city department of which the plaintiff was the sole employee, was legislative in substance. *Id*. at 55. Further, as in *Bagley*, the Alderperson defendants' allegedly improper motives, though frustrating for the plaintiffs, do not factor into the calculus of whether they are protected by legislative immunity for their vote. *Bagley*, 646 F.3d at 394.

The Court concludes, then, that the Common Council and Board of Water Commissioner votes were legislative in form because they were an "integral" step of a municipal governance process. Moreover, the votes were substantively legislative, as they reflected the governing bodies' discretionary authority over spending priorities. Thus, the Alderperson defendants are cloaked in legislative immunity for all claims alleged against them in this action. *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 406 (1979) (defining legislative immunity broadly as "absolute immunity

from *federal damages liability*," without reference to any specific cause of action) (emphasis added).[1]

While legislative immunity relieves the Alderperson defendants of liability, it does not result in the termination of any claims. Each of the remaining defendants—Pacetti, Mayor Bosman, St. Peter, Kerkman, the City, and the Water Utility—is named under at least one of the plaintiffs' federal or state law claims.

### 4.4    First Amendment Retaliation

The plaintiffs assert First Amendment retaliation claims against Pacetti, Mayor Bosman, St. Peter, the City, and the Water Utility. Each relevant count of the Amended Complaint alleges that McAuliffe (or Comsys, through the acts of McAuliffe) engaged in protected expression by: (1) participating in Miskinis' administrative investigation; (2) filing a criminal complaint against Kerkman; and (3) delivering a letter to the Common Council objecting to Pacetti's and Kerman's unlawful conduct.  (Docket #31 ¶¶ 151-241, Ex. K). The plaintiffs allege that Pacetti (Counts Four and Five), Mayor Bosman[2] (Counts Six and Seven), St. Peter (Counts Six and Seven), the

---

[1]In their motion, the defendants requested legislative immunity only for the Alderperson defendants. (Docket #70 at 3–6). Whether other city actors, such as Mayor Bosman, might properly enjoy the same immunity for their roles in the challenged conduct will not be considered. *See Bogan*, 523 U.S. at 55 (holding that the mayor's "introduction of a budget and signing into law an ordinance. . .were formally legislative, even though he was an executive official" because "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions").

[2]The defendants argue that the plaintiffs have not shown sufficient personal involvement by Mayor Bosman to warrant liability. (Docket #70 at 7); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal citations omitted). The parties agree, though, that Mayor Bosman called the

City (Count Eight), and the Water Utility (Count Eight) retaliated against them for their protected speech by threatening to terminate, and ultimately terminating, the Comsys contracts.

Government employers, like private employers, require certain control over their employees' words and actions in order to function efficiently; accordingly, citizens employed by the government must accept some limitations on their freedom during the course of their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006) ("[G]overnment offices could not function if every employment decision became a constitutional matter[.]"). This principle applies to independent government contractors as well. *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996). But at the same time, government employees have private lives, and "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 419. A government employer cannot terminate an employee—or an independent contractor—due to her speech on matters of public concern. *Umbehr*, 518 U.S. at 675 (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

To succeed on such a claim, a plaintiff must establish that (1) her speech was constitutionally protected, (2) she suffered an adverse

---

special meetings that led to the votes on Comsys' contracts and signed Comsys' termination letters. (Docket #78 at 46). Further, the defendants concede that in May 2014, Mayor Bosman "decided to bring [his] concerns about Comsys" to the Common Council for review and possible termination of the contract." *Id.* at 41–42. Given his knowledge of McAuliffe's criminal complaint against Kerkman and the investigation into Pacetti and Kerkman's conspiracy, there exists a question of fact as to whether Mayor Bosman's participation in scheduling the vote showed an appropriate level of personal involvement in the alleged violations of Plaintiffs' rights.

employment action as a result of her protected speech that was sufficiently adverse so as to deter the exercise of the free speech, and (3) her speech was a "substantial" or "motivating" factor for the adverse employment action. *Graber v. Clarke*, 763 F.3d 888, 894–95 (7th Cir. 2014). The Court addresses each element in turn.

### 4.4.1 Whether the Plaintiffs' Speech Was Constitutionally Protected

The first element of the three-part retaliation analysis, whether the speech at issue is constitutionally protected, is subdivided into a two-part inquiry established by the Supreme Court in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The court first determines whether the plaintiff spoke as a citizen, as opposed to as an employee, and whether that speech was on "a matter of public concern." *Graber*, 763 F.3d at 895. If it was, the court then determines "whether the plaintiff's interest in speaking as a citizen on a matter of public concern outweighed the government's interest in controlling that speech to promote the efficiency and effectiveness of serving the public through its employees." *Id.* This is a question of law to be decided by the court. *Id.* at 894 (citing *Gustafson v. Jones,* 290 F.3d 895, 906 (7th Cir. 2002)).

Whether a government employee speaks "as a citizen" for purposes of this analysis turns on whether her speech was made pursuant to her official duties. *Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 346 (7th Cir. 2017). "[P]ublic employees have no cause of action under the First Amendment when they are disciplined for speaking pursuant to their official duties." *Id.* While this inquiry is necessarily tied to the facts of each case, courts in this Circuit have found generally that reporting misconduct is not speech pursuant to official duties when the report is made to someone outside of the employee's department. *See, e.g., Kristofek v. Vill. of Orland Hills*, 832 F.3d 785

(7th Cir. 2016) (finding protected speech where part-time officer reported official misconduct both to his fellow officers and to an *outside* agency, and where the reported misconduct extended beyond the police department and included higher-level political corruption in the mayor's office); *Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008) (public employee's police report alleging she was assaulted by corrections officer was "not made pursuant to her job, as the report was not generated in the normal course of her duties and most likely was similar to reports filed by citizens every day").

The next step of the inquiry is whether the speech at issue was about a matter of public concern. "Speech that serves a private or personal interest, as opposed to a public one, does not satisfy the standards for First Amendment protections." *Houskins*, 549 F.3d at 491–92 (citing *Boyce v. Andrew,* 510 F.3d 1333, 1344 (11th Cir. 2007) ("The relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of the plaintiff's speech was to raise issues of public concern.")). Whether an employee's speech addresses a matter of public concern is determined by the "content, form, and context of a given statement," with the statement's content being the most important factor. *Graber*, 763 F.3d at 895.

Finally, even when the court finds the speech was made by a citizen on a matter of public concern, *Pickering* requires a final step: the court must determine whether the plaintiff's interest in delivering her message of public concern outweighed the government's interest in controlling that speech to promote the efficiency and effectiveness of its operations. *Id.* It is often the case that government employees are the most likely persons in the community to have informed opinions about the administration of the government for whom they work; it is therefore essential that they are able to speak freely on such issues without fear of retaliation. *Biggs v. Vill. of Dupo,*

892 F.2d 1298, 1303 (7th Cir. 1990). On the other hand, a public employer has a "general interest in maintaining a work environment conducive to efficient provision of services: the need for confidentiality; the need to curtail conduct which impedes the employee's ability to perform his or her duties; the employer's need to maintain discipline and harmony among co-workers; and the need to encourage a close and personal relationship between the employee and his or her superiors, where that relationship calls for loyalty and confidence." *Id.*

The plaintiffs seek First Amendment protection for three distinct statements or speech acts. The first occurred during Miskinis' administrative investigation. McAuliffe was interviewed twice by Miskinis as part of his investigation; she answered his questions and also provided additional information about her suspicions that Kerkman had accessed her email account without authorization. Miskinis then met with Pacetti and, shortly afterward, Pacetti summoned McAuliffe to his office to accuse her of sparking Miskinis' investigation, yell at her, and threaten to terminate Comsys' contract if McAuliffe continued to participate in the investigation. (Docket #81 at 15–16). The second statement is the criminal complaint McAuliffe filed against Kerkman in May 2014 accusing him of surveilling her emails without her authorization or consent. *Id.* at 16. The third is the email McAuliffe sent to the members of the Common Council in advance of the June 2, 2014, meeting, which included (1) a copy of a letter Comsys' attorney wrote to the City Attorney "outlining Mr. Kerkman's and Mr. Pacetti's dubious conduct over the prior year"; (2) a copy of the job posting for the City's Director of IT position; and (3) a copy of Miskinis' investigative report. *Id.* at 17.

As to each of these acts, the Court first finds that McAuliffe acted as a private citizen, as opposed to an employee. McAuliffe's normal course of

duties, so far as the Court can discern from the record before it, did not include participating in a police department administrative investigation, filing a criminal complaint against a co-worker, or writing to the Common Council about official misconduct.

Next, McAuliffe's participation in the Miskinis investigation and her e-mail to the Common Council involved matters of public concern. The Miskinis investigation was independently initiated by a government official who was suspicious of wrongdoing by an independent contractor. The public has an interest in the outcome of such an investigation, and McAuliffe's participation therein contributed to a matter of public concern. *See Fairley v. Andrews*, 578 F.3d 518, 524 (7th Cir. 2009) (finding protected speech in employment context when coworkers bullied and threatened plaintiffs to deter them from providing testimony in court proceeding adverse to other coworkers). McAuliffe's email to the Common Council also touched on matters of public concern, as it put government officials on notice of potential official misconduct. *See Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Belk v. Town of Minocqua*, 858 F.2d 1258, 1262–63 (7th Cir. 1988) (municipal employee's threat to file a grievance revealing that two municipal positions were being unlawfully held by a single individual involved a matter of public concern).

McAuliffe's criminal complaint presents a closer question. On one hand, it appears the complaint related solely to Kerkman's unauthorized surveillance of McAuliffe's emails within the workplace. Speech aimed at uncovering wrongdoing or breaches of the public trust is a matter of public concern, but speech aimed at bringing resolution to a personal grievance is not. *Compare Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993) (deputy who made

comments to fellow deputy and local district attorney about superior possibly having stolen department property was speaking on matters of public concern), *with Houskins*, 549 F.3d at 492 (employee who filed a police report alleging she had been battered after a parking lot argument between her and a colleague escalated to physical violence was not speaking on matter of public concern). But the fact that the speaker has a personal stake in exposing the wrongdoing is not alone sufficient to declare that the speech does not also involve matters of public concern. *Glass,* 2 F.3d at 741. In this case, even though McAuliffe's criminal complaint was motivated by a personal grievance, context demonstrates that it, too, touched on a matter of public concern. McAuliffe filed the complaint after she learned from Miskinis that Kerkman was potentially involved in many acts of wrongdoing relating to the City's computer servers. Her complaint added to Miskinis' ongoing investigation, giving the public yet another reason to be concerned about Kerkman.

Finally, the Court must determine whether McAuliffe's interest in delivering her message of public concern outweighed the government's interest in controlling her speech to maintain the efficiency of its operations. *Graber*, 763 F.3d at 895. The record does not reflect a disruption of the efficient provision of services at the City or Water Utility related to any of the subject speech acts. To be sure, McAuliffe's relationship with City officials became strained, but that is precisely her point: she claims she was retaliated against for trying to bring light to the misconduct of a government employee in concert with one of her own employees. Thus, the plaintiffs' interests appear to have outweighed those of the government.

### 4.4.2 Whether the Plaintiffs Suffered a Sufficiently Adverse Employment Action

Having determined that the plaintiffs' speech is constitutionally protected, the Court turns to the second element of the First Amendment analysis—whether the plaintiffs suffered an adverse employment action as a result of the protected speech that was "sufficiently adverse so as to deter the exercise of the free speech." *Graber*, 763 F.3d at 894. An action is sufficiently adverse if it "present[s] an actual or potential danger of deterring or chilling the plaintiff's exercise of free speech." *Id.* at 899. Retaliation need not be "monstrous" to be actionable under the First Amendment; a "campaign of petty harassment may achieve the same effect as an explicit punishment." *Id.* (citations and internal quotations omitted).

The defendants argue that McAuliffe and Comsys did not suffer an adverse employment action sufficient to deter speech because the City and the Water Utility were already in the process of creating an in-house IT department before the speech acts took place. In other words, according to the defendants, the speech acts were not the cause of the alleged retaliation and McAuliffe was not prevented from participating in the investigation or filing her criminal complaint. (Docket #70 at 90-91).

As a result of the speech in question, the plaintiffs claim that Comsys' contracts were terminated and McAuliffe was verbally berated by Pacetti. This is more than sufficient to demonstrate an adverse employment action. *See Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 534 (7th Cir. 2006) (outright discharge and threat of sanctions have been held sufficient to allege First Amendment injury); *see also Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) ("[B]ecause both plaintiffs were terminated, it is undisputed that each suffered a deprivation likely to deter the exercise of free expression.").

Further, there is a genuine issue of material fact as to whether the plaintiffs' speech *caused* the adverse employment action, and therefore summary judgment is inappropriate on this ground.

### 4.4.3 Whether Protected Speech Was a Motivating Factor in Termination

The final inquiry in the First Amendment analysis is whether the plaintiffs' speech motivated the defendants' decision to take adverse action against them. *Massey*, 457 F.3d at 716. The plaintiffs must show that their speech was the but-for cause of the adverse action. *Fairley,* 578 F.3d at 525–26 (evidence that speech was a motivating factor is not enough; demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law). The record is riddled with issues of fact as to whether the Comsys contracts were terminated because of the plaintiffs' speech. The plaintiffs, of course, claim they were, but the defendants claim that, first, discussions about moving the City's IT services in-house began before the plaintiffs' protected speech and, second, that the City and Water Utility had issues at times with Comsys' performance under the contracts.

The persuasiveness of an employer's non-retaliatory explanation for discharging an employee ordinarily is for the finder of fact to assess, and in light of the fact issues underlying this element of the claim, the Court will not grant judgment in the defendants' favor at this stage. *See Massey*, 457 F.3d at 719 (in a First Amendment retaliation claim, summary judgment should be granted only when the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case as to its motivation for taking adverse employment action).

#### 4.4.4    Qualified Immunity for the First Amendment Claims

Having determined that triable issues of fact preclude summary judgment on the plaintiffs' First Amendment claims, the Court turns to the defendants' contention that Pacetti, Mayor Bosman, and St. Peter (the remaining individual government officials against whom First Amendment claims are alleged) are protected under qualified immunity.[3]

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity allows for public officials to be held accountable when they exercise power irresponsibly, but also shields them from harassment, distraction, and liability when they perform their duties reasonably. *Id.* It is not a defense, but rather an immunity from suit, *i.e.,* an entitlement not to stand trial. *See id.*; *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To resolve a government official's qualified immunity claim, courts undertake two inquiries: first, they determine whether the facts a plaintiff has alleged make out a violation of a constitutional right, and, second, whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Id.* at 232. Though the Supreme Court at one time mandated the sequence of these two inquiries, that is no longer the case. *Id.* at 236 ("On reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded

---

[3]The defendants also request qualified immunity for Kerkman, but because he was a Comsys employee at all relevant times, and not yet a City employee, he is not entitled to the immunity available to government officials.

as mandatory."); *see also Scott v. Harris,* 550 U.S. 372, 388 (2007) (Breyer, J., concurring) (counseling against the *Saucier* two-step protocol where the question is "so fact dependent that the result will be confusion rather than clarity").

When an answer to the first question—whether the facts the plaintiffs allege amount to a constitutional violation—is bound up with genuine issues of material fact, the Court will not decide disputed issues of fact, since that is outside the scope of summary judgment. The Court will instead identify disputed and undisputed facts and determine whether any disputed facts are material to the question of qualified immunity. *Hernandez v. Cook Cnty. Sheriff's Office,* 634 F.3d 906, 916, n.13 (7th Cir. 2011). The plaintiffs must proffer facts which, if believed, amount to an actual violation of their constitutional rights. *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *Easterling v. Pollard,* 528 Fed. App'x 653, 656 (7th Cir. 2013). As discussed above, the plaintiffs have done this.

Next, the plaintiffs must show that the right at issue was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling,* 528 Fed. App'x at 656 (citing *Pearson,* 555 U.S. at 232). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011).

As to Pacetti, the question is whether he could have reasonably believed it was consistent with McAuliffe's and Comsys' First Amendment rights to verbally deride McAuliffe for making statements to a police deputy as part of his administrative investigation into another Comsys employee, threaten to terminate Comsys' contracts with the City if McAuliffe brought her conspiracy concerns to law enforcement, and encourage the Common

Council and Water Utility to terminate their contracts with Comsys in retaliation for McAuliffe's efforts to bring to light governmental misconduct that involved him.

As to Mayor Bosman and St. Peter, the question is whether they could have reasonably believed it was consistent with McAuliffe's and Comsys' First Amendment rights to call a special meeting of the Common Council (Mayor Bosman) and the Board of Water Commissioners (St. Peter), encourage those bodies to terminate the Comsys Contracts, and sign off on the terminations after the vote, all in retaliation for McAuliffe airing concerns about an unlawful conspiracy involving Kenosha city officials to a Kenosha police deputy, as part of an ongoing administrative investigation, and to another local police department, by way of a criminal complaint.

The answer to each of these questions is no, and therefore the qualified immunity defense does not protect Pacetti, Mayor Bosman, and St. Peter at this stage of the litigation. As explained more fully above, Supreme Court precedent is clear that government employees, including independent contractors, are entitled to speak on matters of public concern without fear of termination or repercussion because of such speech. *Garcetti*, 547 U.S. at 419; *Umbehr*, 518 U.S. at 675. It is also clear that this right includes speech made as part of law enforcement investigations or court proceedings, *see Fairley*, 578 F.3d at 524, and speech aimed at exposing governmental misconduct to the public, *see Garcetti*, 547 U.S. at 425. Finally, it is clear that termination based solely on an employee's protected speech violates the speaker's First Amendment rights. *See Mosely*, 434 F.3d at 534.

Given this controlling precedent, it was "beyond debate" at the time Pacetti, Mayor Bosman, and St. Peter acted that their conduct—viewed in a light most favorable to the plaintiffs—violated the plaintiffs' First

Amendment rights. After the jury determines the ultimate facts underlying the defense, however, the defendants may revisit it.

### 4.4.5 *Monell* Liability for Violation of the First Amendment

In addition to Pacetti, Mayor Bosman, and St. Peter, the plaintiffs also bring their First Amendment claim against the City and the Water Utility under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). (Docket #31 at ¶¶ 146–150, 233–241). Under *Monell*, municipal liability exists only "when [the] execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. In this sense, "a municipality cannot be held liable under Section 1983 on a *respondeat superior* theory." *Id.* at 691.

"Case law recognizes three ways in which a municipality's policy can violate an individual's civil rights: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal citations and quotations omitted).

Here, the First Amendment claims against the City and Water Utility rely on the third theory of municipal liability described above. *See* (Docket #76 at 30). "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original). The entity responsible for the "management and control" of the City's affairs, including with respect to outside vendors, is the

City Council. *See* Wis. Stat. § 62.11(5). More specifically, pursuant to Wis. Stat. § 62.11(5) ("Powers"):

> except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means.

Wis. Stat. § 62.11(5).

The management and operation of the Water Utility is under the direction of St. Peter, who is appointed by the Board of Water Commissioners. The Board is composed of alderpersons appointed under authority of Section 1.06H of the City of Kenosha Code of General Ordinances. The powers and duties of the Board of Water Commissioners include: establishing policy, adopting rules and regulations, adopting an annual budget, establishing water and sewer rates and fees and approving contracts and agreements.

The defendants do not contest the Common Council's and Board of Water Commissioners' final decision-making authority. Instead, the defendants argue that the City and the Water Utility should not be held liable under *Monell* because plaintiffs must establish that they suffered a constitutional injury in order to maintain a claim under *Monell* and, they argue, the plaintiffs have not done so here. (Docket #70 at 21-22). Because the

Court has determined that triable issues remain as to whether the plaintiffs suffered a First Amendment injury, the *Monell* claims will remain as well.[4]

### 4.5    Fourth Amendment Conspiracy

In Counts One and Two of the Amended Complaint, the plaintiffs claim that Pacetti and Kerkman conspired to unlawfully search the plaintiffs' email archives in violation of the Fourth Amendment. (Docket #31 at ¶¶ 122–145). They claim that sometime around July 2013, Kerkman began soliciting Pacetti to create a Director of IT position for the City and hire Kerkman to fill that position and, at Pacetti's acquiescence or direction, Kerkman accessed McAuliffe's email account and archives without authorization to obtain proprietary information that could be used in furtherance of the pair's plan to move the City's information technology services in-house.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search occurs "either when the government physically intrudes without consent upon a constitutionally protected area in order to obtain information, or when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016) (internal citations and quotations omitted).

A search by a private party does not implicate the Fourth Amendment unless the party is acting as an "instrument or agent" of the government. *United States v. Crowley*, 285 F.3d 553, 558 (7th Cir. 2002). The court considers

---

[4]That the Alderperson defendants (who comprise the Common Council) are shielded by legislative immunity does not bar the *Monell* claims against the City and Water Utility. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict).

several factors to determine whether a private party acted as an "instrument or agent" of the government, including, "whether the government knew of and acquiesced in the intrusive conduct; whether the private party's purpose in conducting the search was to assist law enforcement; and whether the government requested the action or offered the private actor a reward." *Id.* at 558. The party alleging that the Fourth Amendment applies to a search conducted by a private party (here, the plaintiffs) has the burden to establish, by a preponderance of the evidence, that the private party acted as a government instrument or agent. *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987).

While there is no dispute that Kerkman surveilled the plaintiffs' email archives, *see* (Docket #77 at 8-11), the Court finds a genuine dispute of material fact as to whether Kerkman acted as an "instrument or agent" of the government to search the plaintiffs' confidential information, and if so, whether the plaintiffs had a reasonable expectation of privacy in the information searched.

In support of their contention that Pacetti knew of and rewarded Kerkman's search, such that Kerkman was acting as Pacetti's agent, the plaintiffs have put forward the following evidence: Kerkman accessed Comsys employee emails without authorization; Pacetti revealed in conversations with McAuliffe that he had knowledge of at least one item of information that was contained in the private electronic files the plaintiffs claim were surveilled; Pacetti told Miskinis during Miskinis' investigation of Kerkman that he disagreed with Miskinis' findings but that Kerkman had "done some things that he was not proud of"; Pacetti verbally derided McAuliffe based on his belief that she had encouraged Miskinis' investigation; and Pacetti played at least some role in hiring Kerkman for the

position of the City's Director of IT. (Docket #76 at 23-24 and Docket #77 at 21-23).

The defendants argue that the plaintiffs can point to only one piece of Comsys' confidential information that somehow (possibly not through Kerkman) made its way to Pacetti, and that the plaintiffs have not produced evidence showing that Pacetti directed Kerkman or that Kerkman actually conveyed materials or information to Pacetti. (Docket #70 at 16-17). Nonetheless, the Court draws all reasonable inferences in favor of the non-moving party and finds that a question of fact remains as to whether Kerkman acted as Pacetti's agent.

Next, in support of their contention that they had a reasonable expectation of privacy in their confidential information (tax returns, financial information, employee information) contained in surveilled emails, the plaintiffs point to the contract with the City, which provides Comsys with a "dedicated data line" that, they contend, "infers an expectation of privacy." (Docket #76 at 26). Further, Comsys used a segregated part of the city's server separate from the City's portion. *Id.*

The defendants counter that the municipal telephones, computers, servers, supplies, and data lines Comsys used were City property. (Docket #70 at 16-17). This observation, unaccompanied by any citation to legal authority, is insufficient to satisfy the Court that the plaintiffs did not have a reasonable expectation of privacy in the confidential contents of emails sent through the City's servers. *Cf. Katz v. United States*, 389 U.S. 347, 354 (1967) (legitimate expectation of privacy exists in contents of phone conversation); *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972) ("[B]road and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the

application of Fourth Amendment safeguards[.]"); *United States v. Warshak*, 631 F.3d 266, 285–86 (6th Cir. 2010) (analogizing emails to letters, explaining that "trusting a letter to an intermediary does not necessarily defeat a reasonable expectation that the letter will remain private," and noting it "would defy common sense to afford emails lesser Fourth Amendment protection."). Other evidence indicating that Comsys and its employees were on notice that the City could monitor the contents of their email—perhaps in the form of a handbook or policy—might influence this analysis, but absent such evidence, the Court will not grant summary judgment to the defendants on the Fourth Amendment claims.[5]

### 4.5.1 Qualified Immunity for the Fourth Amendment Claims

Having determined that triable issues of fact preclude summary judgment on the plaintiffs' Fourth Amendment claims, the Court turns to the defendants' contention that Pacetti (the remaining individual government official against whom a Fourth Amendment claim is alleged) is protected under qualified immunity.

Pacetti is entitled to qualified immunity on the Fourth Amendment claim if he could have reasonably believed that it was lawful for him to use a

---

[5]The defendants also argue that the "intracorporate conspiracy doctrine" bars the plaintiffs' conspiracy claims against city officials and alderpersons, because the acts of a corporation's agents are considered to be those of a single actor. (Docket #70 at 19-20); *see Jones v. City of Milwaukee*, No. 04-C-618, 2005 WL 2922191, at *14 (E.D. Wis. Nov. 3, 2005) (intracorporate conspiracy doctrine applied to bar Section 1985 conspiracy claims against former mayor and members of police and fire department because "individual Defendants . . . were all employees of the City of Milwaukee during the time at issue."). But the star of the alleged conspiracy was Kerkman, a Comsys employee. Though he eventually became a City employee, the acts underlying the plaintiffs' Fourth Amendment conspiracy claims took place before Kerkman joined the City. Indeed, the plaintiffs claim that the purpose of the conspiracy was to place Kerkman in a desirable City job.

mole employee of the City's IT vendor to search the vendor's confidential communications and electronic archives for information that would help the City build an in-house IT department in place of the vendor.

Because there is clear precedent that a search by a private party implicates the Fourth Amendment if the party is acting as an "instrument or agent" of the government, *Crowley*, 285 F.3d at 558, and that there is a legitimate expectation of privacy in the contents of electronic communications, *Katz*, 389 U.S. at 354, it is "beyond debate" that Pacetti's conduct—viewed in a light most favorable to the plaintiffs—violated their Fourth Amendment rights. Pacetti is therefore not entitled to qualified immunity on the Fourth Amendment claim at this juncture.

### 4.6    Civil Conspiracy

In Count Nine of the Amended Complaint, McAuliffe claims that Pacetti and Kerkman conspired to terminate the City's contract with Comsys, a woman-owned business with several female employees, in favor of replacing the City's IT services with an internal IT department headed by Kerkman, a man, in violation of 42 U.S.C. Section 1985(3).   That statute authorizes an action for the recovery of damages incurred when "two or more persons…conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

The Supreme Court has explained that the purpose of Section 1985 is to provide a remedy for conspiracies involving private actors for any violation of the rights designated within the statute. *Griffin v. Breckenridge,* 403 U.S. 88, 101 (1971). To prove a violation of Section 1985(3), a plaintiff must show "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the

alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1024 (7th Cir. 2000) (citation omitted). To establish that the purpose of the conspiracy is to deprive the plaintiff of equal protection of the laws, the plaintiff "must allege 'some racial, or perhaps otherwise class–based invidiously discriminatory animus behind the conspirators' action.'" *Id.* (citing *Griffin*, 403 U.S. at 102).[6] The Seventh Circuit has clarified that the statute covers "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty." *Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir. 1988).

McAuliffe must do more than allege her suspicion of a discriminatory animus; she must point to some facts in support of her claim. *Munson,* 754 F.2d at 690 (7th Cir. 1985) ("[A]lthough summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of [her] position."). For example, the Seventh Circuit held in *Volk* that a reasonable jury could find discriminatory animus motivated a conspiracy where the defendants rejected the plaintiff "for a position for which she was clearly qualified (compared to the pool of applicants)" and where the plaintiff "presented evidence of discrimination and harassment against several other female workers." *Volk*, 845 F.2d at 1435. In contrast, the only facts McAuliffe cites to establish that a discriminatory animus motivated the conspiracy are that "Comsys is a

---

[6]Though some courts have interpreted *Griffin* as requiring proof of a class-based, invidiously discriminatory animus for conspiracies exclusively involving private actors, the Seventh Circuit requires such proof for all claims under Section 1985, including for conspiracies involving a state actor. *Munson v. Friske*, 754 F.2d 683, 695 n.8 (7th Cir. 1985).

female-owned business that employed numerous female employees" and "Comsys' contract was terminated by a nearly all-male group of defendants (there was only one female alderperson on the Common Council at the time) in favor of replacing its IT services with an internal IT department headed by Kerkman, a male subordinate of McAuliffe." (Docket #76 at 27). The mere happenstance that the complained-of actions benefitted a man to the detriment of a woman does not provide evidence of motive. McAuliffe presents no evidence that the conspirators even considered her sex during their plotting, nor does she present evidence that the conspirators discriminated against other women on the basis of sex.

To the extent a conspiracy existed between Pacetti and Kerkman, plaintiffs' evidence at best implies the conspirators might have had financial motives, but the Supreme Court has refused to construe Section 1985(3) to reach conspiracies motivated by economic or commercial animus. *Munson*, 754 F.2d at 695 (citing *United Brotherhood of Carpenters and Joiners v. Scott*, 463 U.S. 825 (1983)).

Because McAuliffe "presents no indications of motive and intent supportive of [her] position," her Section 1985(3) claim will be dismissed.

### 4.7    Failure to Protect

In Count Ten of the Amended Complaint, McAuliffe alleges that the Alderperson Defendants failed to protect her rights, in violation of 42 U.S.C. Section 1986, by not investigating the conspiracy allegations detailed in the June 2, 2014 letter, and that Mayor Bosman and St. Peter also failed to protect her rights by authorizing termination of the Comsys Contracts and failing to investigate McAuliffe's conspiracy claims.

Section 1986 provides, in relevant part, that "[e]very person who, having knowledge that any of the wrongs. . .mentioned in section 1985 of this

title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured." 42 U.S.C. § 1986. This Section is derivative of Section 1985. *Grimes v. Smith*, 776 F.2d 1359, 1363 (7th Cir. 1985). Because McAuliffe has not submitted evidence to support a viable claim under Section 1985, her Section 1986 must also be dismissed.

### 4.8     Fifth Amendment Takings Clause

In Count Eleven, Comsys asserts a Fifth Amendment Takings Clause claim against the City and the Water Utility. The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. That clause restricts the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 491 (1960).

For a Takings Clause claim to lie, the plaintiff must have a "property interest" in that which it claims the government has confiscated. *See Muscarello v. Ogle Cnty. Bd. of Comm'rs,* 610 F.3d 416, 423 (7th Cir. 2010) (citing *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9 (1978)). Though the Clause traditionally focused on physical or intellectual property, its protection can include other interests, such as trade secrets protected under state law, *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984), and the economically beneficial use of property, *Lucas v. S. C. Coastal Council,* 505 U.S. 1003, 1019 (1992). Whatever the "property interest" in question, the State must actually *take it* for a Takings Clause action to exist, transferring the property either to itself or to a private party for public use. *See Kelo v. City of New London,* 545 U.S. 469, 484 (2005).

Comsys claims it had a protectable property interest in its contracts with the City and Water Utility, and in its "intangible assets—employment agreements, business goodwill, trade secrets and confidential information." (Docket #76 at 31). But the facts Comsys has raised are insufficient for the Court to find a protectable property interest in those items.

As to Comsys' contracts with the defendants, it is undisputed that they were terminable at-will by either party with or without cause on one year's notice, and this notice was provided. (Docket #78 at 2-3). Comsys does not provide legal support for its contention that it has a protectable property interest in a terminable contract, which was properly terminated, simply because the contract involved the government. *See Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) (stating that "the existence of a state contract, simpliciter, does not confer upon the contracting parties a constitutionally protected property interest" and that "[w]e have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property.").

To the contrary, Fifth Amendment jurisprudence teaches that a Takings Clause claim will not lie where the government, as a party to a contract, acts in its proprietary, as opposed to sovereign, capacity. *See Cannon v. Forest Pres. Dist. of Cook Cnty., Ill.*, No. 14-C-5611, 2016 WL 2620515, at *5 (N.D. Ill. May 9, 2016). For example, the court in *Janicki Logging Co. v. United States* held that the termination of one portion of a timber sales contract did not effect a taking of any contract rights because the government acted in a proprietary capacity, in accordance with its rights under the contract. 36 Fed. Cl. 338, 346 (Fed. Cl. 1996) ("Hence, rather than acting as a sovereign and taking plaintiff's property for public use, the Forest Service acted in a proprietary capacity as a party to a contract and purported to exercise its

rights for which it bargained in the contract."). As in *Janicki Logging Co.,* a Fifth Amendment claim cannot lie in this case based on the City's and Water Utility's actions taken as proprietors pursuant to contracts.

As to Comsys' "employment agreements, business goodwill, trade secrets and confidential information," Comsys has not identified, apart from one piece of salary information, any specific item of confidential property that made its way from Comsys' surveilled computer system to officials within the City or the Water Utility. The Court cannot undertake an appropriate analysis as to whether Comsys adequately safeguarded its intangible business assets, so as to make them protectable under the Fifth Amendment, because Comsys has not described in any detail for the Court which business assets have actually been taken by the City or the Water Utility. The Supreme Court teaches, for example, that an intangible business asset might be protectable under the Fifth Amendment if it qualifies as a trade secret under state law. *Ruckelshaus*, 467 U.S. at 1001-02. However, without evidence of which business assets in particular have been taken by the defendants and how they are protected as a property interest under "existing rules or understandings that stem from an independent source such as state law," *id.* at 1001, the Court is simply unable to undertake an informed analysis to determine whether the defendants have effected an unlawful taking of such assets.

Comsys' Fifth Amendments claims must therefore be dismissed.

**5.      STATE LAW CLAIMS**

The defendants also seek summary judgment on the plaintiffs' state law claims alleged in Counts Twelve through Twenty of the Amended Complaint, over which this Court exercises supplemental jurisdiction. They argue that the claims fail as a matter of law, that state law immunity applies,

and that the claims are precluded due to plaintiffs' failure to comply with the notice requirements provided in Wisconsin Statutes section 893.80(1d). Because most of the state law claims fail as a matter of law, the Court will only address the questions of immunity and notice where the claims are otherwise viable.

### 5.1    Breach of Contract

In Counts Eighteen and Nineteen of the Amended Complaint, Comsys brings state law claims for breach of contract. Count Eighteen is alleged against the Water Utility for underpayment of amounts due under its contract with Comsys and Count Nineteen is alleged against both defendants for breach of the implied contractual covenant of good faith in their respective contracts with Comsys.

As to Count Eighteen, Comsys claims that in late December 2014, the Water Utility began "unilaterally and improperly shifting Comsys' billed hours between itself and Kenosha, thereby utilizing differences in the City Contract and the Water Utility Contract to cause a reduction in Comsys' pay. As a result, Comsys has not been paid $37,957.96 for work performed under the Water Utility Contract." (Docket #31 ¶¶ 313-14).

The defendants submitted an affidavit by Cathy Brnak, the Director of Business Services for the Water Utility, in which she defends the Water Utility's calculation and payment of amounts owed under its contract with Comsys. (Docket #63). McAuliffe submitted her own affidavit pointing to inaccuracies in Brnak's facts and figures, concluding that Comsys was in fact underpaid. (Docket #81 at 33-38). While neither party presented substantial evidence or legal argument on this claim, the burden rests with the defendants to prove they are entitled to judgment as a matter of law, and they have not met that burden. The parties' dueling affidavits leave a triable issue

of material fact as to whether Comsys breached its contract with the Water Utility.

As to Count Nineteen, which Comsys supports by pointing to its theory of a conspiracy between city officials and a rogue Comsys employee, Comsys has not put forward evidence sufficient to demonstrate a remediable breach of good faith. Comsys is correct that an implied duty of good faith and fair dealing is a part of the contracts, just as it is a part of every contract governed by Wisconsin law. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 765–66 (7th Cir. 2010) (interpreting Wisconsin law). Although "good faith" is a difficult term to define, Wisconsin courts have attempted to define "bad faith" with examples including "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.* at 766 (citing *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 213 (Wis. 1995) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d)).

Comsys complains that the culmination of the bad faith conspiracy was the termination of its contracts, but admits that the contracts allowed for termination without cause upon giving one year's notice, which was given. (Docket #78 at 2-3). Though it is possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract, *Foseid*, 541 N.W.2d at 212, the City and Water Utility's acts of terminating contracts pursuant to the express termination provisions is not an evasion of the spirit of the parties' agreement sufficient to impose liability for bad faith. *See Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 431 N.W.2d 721, 726 (Wis. Ct. App. 1988) ("[W]here, as here, a contracting party complains of acts of the other party which are specifically authorized in their agreement, we do not see how

there can be any breach of the covenant of good faith."). Further, Comsys argues that the defendants breached the duty of good faith in their contracts by "soliciting a Comsys employee in violation of his Employment Agreement and misappropriating Comsys['] confidential and proprietary property and information necessary for the City and KWU to service their IT needs in-house." (Docket #76 at 37-38). But while these facts might, with more development, form the basis of some other claim (breach of an employment agreement or misappropriation, for example), they do not create a breach of the duty of good faith implied in the contracts at issue.

The Court will, therefore, grant summary judgment to the defendants as to the plaintiffs' claim of breach of the implied duty of good faith, but will deny it as to the Comsys' claim that it was underpaid on its contract with the Water Utility.[7]

### 5.2    Conversion

In Count Twenty, Comsys alleges a claim of conversion against Kerkman and Pacetti for intentionally taking "possession and control of Comsys' business assets including, but not limited to, its confidential and

---

[7]The defendants asked that all state law claims, including the breach of contract claim, be dismissed for failure to provide timely notice under Wisconsin's notice of claim statute. Wis. Stat. § 893.80(1d)(a). The statute requires, as a precondition to suit against a municipality or its employees, that notice be served upon the municipality or employee within 120 days after the happening of the event giving rise to the claim. *Id.* As to their claims stemming from the Water Utility's underpayment, the plaintiffs submitted evidence that they provided a notice of claim to the Water Utility on February 25, 2015, which they amended on April 13, 2015, to demand additional payments. (Docket #80 at Ex. 29). The events comprising the breach relate to underpayments for the year of 2014 and extended at least into February 2015, as plaintiffs allege an error with the February 2015 check that prevented them from cashing it. (Docket #81 at 35-36). The plaintiffs' February 25, 2015, notice is sufficient to satisfy the statutory notice requirements.

proprietary business information and trade secrets, its profits, its contracts and its employees." (Docket #31 at 79).

Conversion is the "intentional, unauthorized control of another's chattel so as to interfere with the owner's possessory rights." *Midwestern Helicopter, LLC v. Coolbaugh*, 839 N.W.2d 167, 170 (Wis. Ct. App. 2013). Liability arises when a person "(1) intentionally controls or takes property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the owner's rights to possess the property." *Id.*

Wisconsin law has traditionally limited conversion claims to tangible property. *See Prod. Credit Assoc. of Madison v. Nowatzski*, 280 N.W.2d 118, 123 (Wis. 1979) (defining a claim for conversion by referring only to chattel); *see also FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 303-04 (7th Cir. 1990) (interpreting Illinois law and noting that "[i]n cases where the alleged converter has only a copy of the owner's property and the owner still possesses the property itself, the owner is in no way being deprived of the use of his property. The only rub is that someone else is using it as well."). While other courts have broadened the common law claim to include electronic records, there is, at least so far, no support from Wisconsin courts for such an expansion of this state's common law. *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-CV-748-WMC, 2016 WL 4033276, at *27-28 (W.D. Wis. July 27, 2016) (finding no indication that Wisconsin courts would recognize a claim for conversion of intangible property).

Even if the Court were to interpret Wisconsin's law of conversion to include intangible property, Comsys' claim nonetheless fails. As to the claim against Pacetti, the only piece of confidential information Comsys has shown made its way to Pacetti is salary information relating to a Comsys employee; its allegations that other business information was taken by the City are made

on information and belief and not further supported in the record. Comsys has not put forward evidence that Pacetti's knowledge of a Comsys employee's salary, even if meant to be confidential, caused the kind of "serious interference" with its own possession that the tort of conversion is meant to remedy.

As to Kerkman, Comsys puts forward evidence that, during his unauthorized surveillance of Comsys emails, he had access to a host of confidential information, including financial information. But Comsys provides no legal support for its contention that unauthorized access to company data by an employee amounts to "control" of that property resulting in "serious interference" with the company's right to possess it. Comsys has not identified for the Court which pieces of its information Kerkman *took* from Comsys' possession. And to the extent Comsys alleges that Kerkman (or Pacetti) took trade secrets from Comsys, that claim is precluded by Wisconsin's trade secret act. *See Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 793 (tort claims dependent on the existence of trade secrets, as defined in Wis. Stat. § 134.90(6)(b), are preempted by the state trade secret statute).

Finally, the plaintiffs claim that Comsys' base of employees was converted by Kerkman and Pacetti through their conspiracy to steer the City's Director of IT position to Kerkman and then use Kerkman to hire Comsys employees directly. (Docket #76 at 38). The plaintiffs conclude, without citation to any legal authority, that they "clearly have a personal property interest in Comsys' business contracts, including those with its employees." *Id.* The Court will not consider a legal argument so insufficiently developed. *See White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 476 (7th Cir. 2009) ("... it is

not the province of the courts to complete litigants' thoughts for them, and we will not address this undeveloped argument").

Accordingly, Comsys' conversion claims against Kerkman and Pacetti will be dismissed.

### 5.3 Extortion and Intimidation of a Victim

In Count Thirteen, the plaintiffs bring a claim for civil extortion against Pacetti under Wisconsin Statutes section 943.30 alleging that "Pacetti's repeated threats to McAuliffe and Comsys that he would terminate the City Contract if any criminal action was taken against Kerkman relating to the investigations against Kerkman. . .constituted a threat to plaintiffs' property, business, calling or trade, or the profits and income and profession." (Docket #31 ¶ 279).

The defendants ask for dismissal of the claim because Section 943.30 is a criminal statute that does not provide a private cause of action. (Docket #70 at 32-33); *see AnchorBank, FSB v. Hofer*, No. 09-CV-610-SLC, 2012 WL 8261627, at *24 (W.D. Wis. Sept. 20, 2012) (finding no indication that Wisconsin interprets the criminal extortion statute to include a private right of action). The plaintiffs counter by directing the Court to a 1936 Wisconsin Supreme Court case implying that such an action might be brought if injury to business is alleged. (Docket #76 at 39); *see Judevine v. Benzies-Montanye Fuel & Warehouse Co.*, 269 N.W. 295, 301 (1936).

The Court does not find adequate support in Wisconsin law for the availability of a private cause of action under the state's criminal extortion statute. Indeed, the Wisconsin Statutes do provide a civil remedy for injury caused by violation of some enumerated criminal statutes, *see* Wis. Stat. § 895.446, but Wisconsin Statutes section 943.30 is not among the list.

McAuliffe also brings a similar claim in Count Seventeen against Pacetti for intimidation of a victim in violation of Wisconsin Statutes sections 940.44 and 940.45, which are also criminal statutes. (Docket #31 ¶¶ 306-11). As with Section 943.30, the Court finds no authority suggesting there is a private right of action under Section 904.44 or 940.45.[8]

Therefore, the plaintiffs' extortion and victim intimidation claims against Pacetti will be dismissed.

### 5.4    Injury to Business Under Wis. Stat. § 134.01

In Count Fourteen, the plaintiffs accuse Pacetti and Kerkman of willfully and maliciously conspiring to injure plaintiffs and their reputation, trade, and business by misappropriating their confidential and proprietary business information, trade secrets, goodwill, and contracts in violation of Wisconsin Statute sections 134.01. (Docket #31 ¶ 285).

Wisconsin's "injury to business" statute provides criminal liability for "[a]ny 2 or more persons who. . .combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever." Wis. Stat. § 134.01. The Wisconsin Supreme Court has found that, although it is a criminal statute, Section 134.01 "provides the basis for civil tort liability." *Brew City Redevelopment Grp., LLC v. Ferchill Grp.,* 724 N.W.2d 879, 885 (Wis. 2006) (citing *Radue v. Dill,* 246 N.W.2d 507 (1976)).

To prevail on a Section 134.01 claim, a plaintiff must prove that "(1) the defendants acted together; (2) with a common purpose to injure the plaintiff's

---

[8]The defendants did not mention the claims under Wisconsin Statutes sections 940.44 and 940.45 until their reply brief, and then only in a fleeting sentence. (Docket #84 at 13). The Court is reluctant to consider an argument so underdeveloped, *see Darif v. Holder,* 739 F.3d 329, 336 (7th Cir.2014), but because the Court finds no basis for the claims to survive, it will dismiss them.

reputation or business; (3) with malice; and (4) the plaintiff suffered financial harm." *Virnich v. Vorwald*, 664 F.3d 206, 213 (7th Cir. 2011), *as amended* (Jan. 3, 2012) (citing Wis. Jury Instructions Civil 2820). Malice, for purposes of a Section 134.01 claim, means "'doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition].'" *Id.* (citing *Maleki v. Fine–Lando Clinic Chartered, S.C.,* 469 N.W.2d 629, 635 (1991), quoting *Aikens v. Wisconsin,* 195 U.S. 194, 203 (1904)). A *rational* desire to cause harm for the sake of competitive advantage is not actionable under Section 134.01. *Id.*

The crux of the plaintiffs' theory in this case is that Kerkman conspired with Pacetti, and others within the City government, to obtain a desirable Director of IT position with the City, and that Pacetti rewarded Kerkman for unlawfully obtaining Comsys' insider information by giving him the job. In other words, the plaintiffs have pled themselves out of a Section 134.01 claim by arguing that the defendants acted for the sake of gaining a competitive advantage.

Plaintiff's claim under Wisconsin Statutes section 134.01 will be dismissed.

### 5.5    Intentional Infliction of Emotional Distress

In Count Twelve of the Amended Complaint, McAuliffe brings a claim against Pacetti for intentional infliction of emotional distress, alleging that he "repeatedly harassed, threatened and intimidated McAuliffe by repeatedly threatening to cancel the City Contract in the event she did not cause the investigations into Kerkman to cease." (Docket #31 ¶ 272). The "joint purpose" of Pacetti's conduct, she claims, "was to intimidate and extort

McAuliffe into withdrawing her criminal complaint against Kerkman and to cause her to suffer emotional distress." *Id.* ¶ 273.

To prove intentional infliction of emotional distress, a plaintiff must establish: "(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *Rabideau v. City of Racine*, 627 N.W.2d 795, 802–03 (Wis. 2001) (citing *Alsteen v. Gehl*, 124 N.W.2d 312, 318 (Wis. 1963); Wis. Jury Instructions Civil 2725).

The "extreme and outrageous" element sets a high bar for actionable conduct. The Wisconsin Supreme Court instructs that, for liability to lie, the average member of the community must regard the defendant's conduct as being "a complete denial of the plaintiff's dignity as a person." *Alsteen*, 124 N.W.2d at 318; *see also* Wis JI–Civil 2725 (2014). In *Alsteen,* for example, a home improvement contractor's verbally abusive conduct, misleading statements, and unprompted alterations to the project's scope were not sufficiently egregious to support a cause of action for intentional infliction of emotional distress. *Alsteen*, 124 N.W.2d at 361. Similarly, the court in *Garvey v. Buhler* concluded that an employee's termination "to make an example of her to other store managers" would not support an action for intentional infliction of emotional distress. 430 N.W.2d 616, 617 (Wis. Ct. App. 1988). In contrast, the plaintiff in *Kroeger v. Brautigam* presented a triable issue as to whether "twice driving [a] vehicle at [her] and nearly striking her" could be sufficient to support a damages award for intentional infliction of emotional distress. 2016 WI App 75, ¶ 20, 371 Wis. 2d 758, 886 N.W.2d 592 (Wis. Ct. App. 2016).

McAuliffe argues that "Pacetti's conduct here was extreme and outrageous in that he is yelling at and threatening a victim of a crime with the loss of livelihood and is further pounding on his desk to create an intimidating atmosphere." (Docket #76 at 41). McAuliffe has not pointed to any case finding similar conduct to be "extreme and outrageous." Rather, Wisconsin courts are clear that verbally abusive conduct and threats to employment are not sufficiently outrageous to satisfy an intentional infliction of emotional distress claim.

McAuliffe cannot prove that Pacetti's conduct was "extreme and outrageous," and therefore her claim for intentional infliction of emotional distress will be dismissed.

### 5.6    Tortious Interference

In Counts Fifteen and Sixteen, Comsys brings claims for tortious interference against Pacetti and Kerkman, respectively. In Wisconsin, interference with a present or prospective contractual relationship requires proof of the following five elements: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs.*, 717 N.W.2d at 796.

Comsys accuses Pacetti of interfering with its relationships with Kerkman and two other (now former) Comsys employees, Peter Dunasky ("Dunasky") and Jason Paul ("Paul"), by causing them to breach their employment agreements. (Docket #31 ¶¶ 287-97). Comsys also claims Pacetti interfered with its contractual relationships with the City and the Water

Utility by misappropriating its confidential business information and disparaging Comsys and McAuliffe to Kenosha representatives. *Id.*

Comsys similarly accuses Kerkman of interfering with its relationships with Paul and Dunasky by soliciting them to violate their employment agreements, and with the City and the Water Utility by misappropriating business information and causing the City and Water Utility to terminate their contracts. (Docket #31 ¶¶ 298-305).

As for the claims against Pacetti, the Court need not go any further in its analysis because the plaintiffs did not provide timely notice under Wisconsin's notice of claim statute. Wis. Stat. § 893.80(1d)(a); *see supra* note 7.

The parties agree that Comsys sent a letter of formal notice in August 2015 detailing the claims and injuries it suffered as a result of Pacetti's and Kerkman's conduct. (Docket #78 at 69-70). But that letter was more than a year after the City and Water Utility terminated their contracts with Comsys, and long after the City hired the two employees with whom the plaintiffs claim Pacetti and Kerkman interfered. *Id.* at 38-39 (Dunasky was hired in December 2014 and Paul was hired in February 2015).

The plaintiffs nonetheless claim compliance with the statute because Comsys' attorney sent a letter on June 2, 2014 "to the City attorney and all alderpersons that spells out in detail the facts and circumstances substantiating plaintiffs' claims and warns the City against further violation of plaintiffs' rights." (Docket #81 at 35-36). The June 2 letter, though, was not a notice of claim as imagined by Wisconsin's notice statute; it highlighted potential governmental misconduct, certainly, but it did not specify the claims the plaintiffs would allege or provide an estimation of damages. Such notice does not amount to compliance with the statute. *Figgs v. City of Milwaukee*, 357 N.W.2d 548, 554 (1984) ("[A] dollar amount of a damage claim

must be stated in a notice of claim in order to give the municipality a meaningful and knowledgeable opportunity to settle the claim."); *Gutter v. Seamandel*, 308 N.W.2d 403, 407 (1981) ("This court has in numerous cases held that implicit in the claim statute is the requirement that a claim set forth a specific dollar amount.").

As for the claim against Kerkman, however, at least some of the facts underlying the claim occurred before May 2014 when he became a City employee. As to that portion of the claim, Wisconsin's municipal notice statute does not apply, and the Court will analyze whether dismissal is appropriate as a matter of law.[9]

The Court finds that a genuine dispute of material fact exists as to whether Kerkman, before May 2014, tortuously interfered with Comsys' contracts with the City and Water Utility. The defendants argue that St. Peter started the wheels in motion to bring Kenosha's IT function in-house long before the start of plaintiffs' conspiracy timeline, *see, e.g.,* (Docket #78 at 20-23), but the plaintiffs' evidence suggests at least the possibility that Kerkman

---

[9]The defendants argue that state law immunity applies to bar all intentional tort claims, including those against Kerkman, but no such immunity is available to him for the portion of the only tort alleged against him that remains because it is limited to acts taken before he became a municipal employee. More specifically, Wisconsin Statutes section 893.80(4), which bars suits against municipal officers or employees for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions" is not available because Kerkman is sued in his individual capacity. And "discretionary immunity," or public officer immunity, which Wisconsin courts recognize as the immunity that protects state officers and employees from personal liability for injuries resulting from acts performed within the scope of their official duties, is not available because (for the portion of the tort that survives) Kerkman was not a City employee. *See Umansky v. ABC Ins. Co.*, 319 Wis. 2d 622, 631–32 (Wis. 2009) (explaining contours of public officer immunity).

influenced the City's and Water Utility's decision to terminate their contracts with Comsys. *Id.*

Accordingly, Comsys' claim of tortious interference against Pacetti is dismissed for failure to comply with Wisconsin Statutes section 893.80(1d)(a), and the claim against Kerkman will remain as to the allegations that predate Kerkman's employment with the City.

**6.     CONCLUSION**

In light of the foregoing, defendants' motion for summary judgment will be granted in part and denied in part.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #57) be and the same is hereby **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that the following claims of the Amended Complaint (Docket #31) be and the same are hereby **DISMISSED**:

Count Six, as to the Alderperson Defendants; Count Seven, as to the Alderperson Defendants; Count Nine; Count Ten; Count Eleven; Count Twelve; Count Thirteen; Count Fourteen; Count Fifteen; Count Sixteen, as to defendant Merril A. Kerkman, Jr. as provided in this Order; Count Seventeen; Count Nineteen; and Count Twenty; and

**IT IS FURTHER ORDERED** that Eric J. Haugaard, Rhonda Jenkins, Jan Michalski, Scott N. Gordon, Rocco L. LaMacchia, Sr., Dave Paff, Kurt Wicklund, Keith W. Rosenberg, Anthony Kennedy, Curt Wilson, Daniel L. Prozanski, Jr., Jack Rose, and Robert C. Johnson be and the same are hereby **DISMISSED** from this action.

Dated at Milwaukee, Wisconsin, this 9th day of May, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge