# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| COMSYS INC. and KATHRYNE L. MCAULIFFE,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF KENOSHA, WISCONSIN, CITY OF KENOSHA WATER UTILITY, FRANK PACETTI, EDWARD ST. PETER, MERRIL A. KERKMAN, JR., and KEITH G. BOSMAN,<br><br>        Defendants. | Case No. 16-CV-655-JPS<br><br><br><br>**ORDER** |

1. **INTRODUCTION & PROCEDURAL HISTORY**

This litigation arises from the termination by the City of Kenosha (the "City") and the Kenosha Water Utility (the "Water Utility") of their contracts with an outside information technology vendor, Comsys Inc. ("Comsys"), a private, for-profit Wisconsin corporation based in Racine. Comsys and its sole shareholder, Kathryne McAuliffe ("McAuliffe"), brought a litany of claims against the City and the Water Utility, as well as many individual defendants, including, the City's mayor Keith Bosman ("Mayor Bosman"), the City's administrator Frank Pacetti ("Pacetti"), the general manager for the Water Utility Edward St. Peter ("St. Peter"), the City's alderpersons, and a former Comsys employee, Merril A. Kerkman, Jr. ("Kerkman").

The plaintiffs brought claims under 42 U.S.C. §§ 1983, 1985, and 1986 seeking damages to remedy various First, Fourth, and Fifth Amendment violations, as well as claims for alleged violations of several Wisconsin state statutes. *See generally* (Docket #31). The allegations underlying both the federal and state law claims concern certain IT service contracts that the City and the Water Utility entered into with Comsys from approximately 1987 until 2015 (the "Comsys Contracts"). *Id.* ¶¶ 32–42. The plaintiffs claim that the events leading up to—and ultimately culminating in—the termination of the Comsys Contracts involved a complex conspiracy among various government officials and a rogue former employee who now works for the City. *Id.* ¶¶ 32–121.

The defendants brought a motion to dismiss under Rule 12(b)(6), pursuant to which the Court dismissed one count of the Amended Complaint (a *Monell* claim against the City and Water Utility for Fourth Amendment violations) as well as the plaintiffs' official capacity claims asserted against the individually-named defendants. (Docket #41).

The defendants then filed a motion for summary judgement under Rule 56 seeking dismissal of all claims. The Court granted it in part and denied it in part. *See generally* (Docket #114). Specifically, the Court dismissed the plaintiffs' federal claims for civil conspiracy, failure to protect, and Fifth Amendment takings. *Id.* at 32–37. It also dismissed the plaintiffs' state law claims for breach of the implied contractual covenant of good faith, conversion, civil extortion, victim intimidation, injury to business, intentional infliction of emotional distress, and, as to one defendant, tortious interference. *Id.* at 37–50. The claims that remained following summary judgment included two federal claims (for violations of the First and Fourth Amendments) and two state law claims (a breach of

contract claim against the Water Utility for underpayment of amounts due under its contract with Comsys and a claim for tortious interference against Kerkman).

The First Amendment claim is alleged against Pacetti, Mayor Bosman, St. Peter, the City, and the Water Utility. Pacetti, Mayor Bosman, and St. Peter argued in their Rule 56 motion that they were entitled to qualified immunity, and the Court declined to apply the defense at the summary judgment stage. *Id.* at 23–26. Similarly, as to the Fourth Amendment claim alleged against Pacetti and Kerkman, the Court declined Pacetti's request for qualified immunity. *Id.* at 31–32.[1]

The defendants then filed an interlocutory appeal of the Court's denial of qualified immunity. (Docket #117). In light of the appeal, the Court stayed proceedings in this case. (Docket #116). On July 12, 2018, the Court of Appeals issued its mandate, reversing this Court's denial of qualified immunity as to Pacetti, Mayor Bosman, and St. Peter. (Docket #132). With those defendants excused from liability, the only defendants remaining in the case are the City, the Water Utility, and Kerkman.

On September 4, 2018, the remaining defendants filed a second motion for summary judgment. (Docket #134). They ask the Court to dismiss the First Amendment and Fourth Amendment claims in light of the Seventh Circuit's pronouncements in the interlocutory appeal about the law applicable to those claims. *Id.* In response, the plaintiffs argue that no legal or factual bases exist to dismiss their First Amendment claim against the City and Water Utility, brought under *Monell*. (Docket #137). However,

---

[1] Kerkman was not a government official during the timeframe relevant to the Fourth Amendment claim, and therefore the defense of qualified immunity would not be available to him on that claim.

the plaintiffs concede that their Fourth Amendment claim must be dismissed. *Id.* In light of the parties' agreement, the Court will dismiss that claim (Counts One and Two of the Amended Complaint). Neither the plaintiffs nor the defendants address the remaining state law claims.

## 2. STANDARD OF REVIEW

The same standard announced in the Court's order on the defendants' first motion for summary judgment applies to the instant motion as well.

When a party files a motion for summary judgment, it is her "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund,* 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to demonstrate a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where. . .the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz,* 778 F.3d at 601. A

court considering a motion for summary judgment must draw all reasonable inferences from the materials before it in favor of the non-moving party. *See Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). A court will deny a motion for summary judgment when "one or more material facts are disputed or… the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Hotel 71 Mezz,* 778 F.3d at 602.

3. **RELEVANT FACTS**

Apart from a short set of supplemental facts proposed by the plaintiffs, the parties did not include new facts in their briefing.[2] They agree that the relevant facts are unchanged since their previous submissions. Therefore, the Court will reproduce its summary of the relevant facts here.

Beginning in the late 1980s, Comsys began performing IT services for the City and the Water Utility as an independent computer facilities management provider. In that role, Comsys performed various functions such as furnishing professional and technical assistance in connection with IT management, information system administration, and programming support services. Comsys had contracts with the City and the Water Utility, each of which were amended over time. (Docket #77 at 5). Kerkman was a

---

[2]The plaintiffs' new proposed facts generally relate to the Kenosha Police Department's investigation of Kerkman and McAuliffe's criminal complaint against Kerkman; the plaintiffs point out in their proposed facts that the Comsys Contracts did not require Comsys or McAuliffe to participate in internal police investigations or to report public corruption. (Docket #138). The defendants do not dispute any of the plaintiffs' new proposed facts, but they argue the new facts are immaterial to resolution of their motion. (Docket #140). These facts bolster the Court's previous finding that McAuliffe spoke as private citizen, not an employee, during the police investigation and when filing her criminal complaint, but they are not necessary to resolution of the instant motion.

longtime employee of Comsys, and from January 1, 2013 until March 31, 2014, he served as the company's Chief Information Officer. *Id.*

The Amended Complaint alleges an elaborate conspiracy between Pacetti, the city administrator, and Kerkman, his mole, to misappropriate Comsys' goodwill, confidential information, trade secrets, and employees so that the City could create its own IT department. More specifically, the plaintiffs allege that sometime around July 2013, Kerkman buddied up to Pacetti, soliciting him to create a Director of IT position for the City and hire Kerkman to fill that role. To that end, the plaintiffs claim that Kerkman unlawfully obtained access to Comsys' and McAuliffe's confidential data by unlawfully surveilling Comsys' and McAuliffe's email accounts and archives, and then passed that information along to Pacetti for his use in building an in-house IT department for the City.

Kerkman's and Pacetti's conspiracy was confronted with a hiccup in February 2014, the plaintiffs claim, when Deputy Chief Daniel Miskinis ("Miskinis") of the Kenosha Police Department began an administrative investigation to determine whether Kerkman had complied with a 2009 directive not to archive City Police Department emails on the City's computer server. *Id.* at 17. On March 7, 2014, Miskinis met with McAuliffe to question her (and another Comsys employee) in connection with his investigation into Kerkman. McAuliffe gave true and accurate responses to Miskinis' questions and performed actions on the City's server at his direction.

Miskinis met with McAuliffe again a couple of days later, and during that interview, McAuliffe told Miskinis about a 2013 meeting between Kerkman and Pacetti where the two men discussed the police department emails being archived on the City's server. She also told Miskinis that she

Page 6 of 19

had reason to believe Kerkman had accessed her email account without authorization because in the fall of the previous year, McAuliffe discovered a confidential email printed from her archives on Kerkman's desk. *Id.* at 10–11.

Around this time, Pacetti requested a meeting with the Police Chief and Miskinis, wherein he expressed disagreement with Miskinis' findings in the Kerkman investigation at that point. *Id.* at 19. Pacetti also summoned McAuliffe to his office, and during the meeting, according to McAuliffe, Pacetti yelled at her and banged his fist on the desk, accusing her of initiating the Kerkman investigation and threatening wholesale changes to the IT department, leaving McAuliffe in tears. *Id.* at 20. Shortly afterward, McAuliffe spoke with Kenosha Joint Services Director Thomas Genthner who informed her that Pacetti asked him for copies of Comsys' contract that day and said the relationship between Joint Services and Comsys needed to be re-examined. *Id.* The next day, Kerkman told McAuliffe he was ill and went on indefinite sick leave. *Id.* He was hired by the City as its Director of IT on May 1, 2014. (Docket #78 at 37).

Sometime between March 17 and March 19, 2014, Pacetti again met with Miskinis, expressed agitation with Miskinis' continued investigation, and requested that Miskinis provide him with advance notice prior to Kerkman's arrest, which Miskinis declined. (Docket #77 at 20–21). Pacetti told Miskinis that Kerkman had "done some things that he was not proud of[,]" but nonetheless told Miskinis that if Kerkman was found guilty of the charges "there would be wholesale changes in IT." *Id.* at 21. Pacetti also called another meeting with McAuliffe, wherein he threatened termination of the Comsys contract if an adverse result occurred for Kerkman pursuant to the investigation. *Id.*

Miskinis concluded from his investigation that Kerkman had not complied with the 2009 directive, had accessed Comsys employee emails without consent, and had improperly deleted public records, among other misconduct. *Id.* at 17–18. As a result, Miskinis recommended that Kerkman be investigated for possible criminal computer crimes and that Kerkman's administrative access to the City's and police department's networks be suspended. *Id.*

On May 1, 2014, McAuliffe filed a criminal complaint against Kerkman with the Kenosha County Sheriff's Department accusing him of surveilling her email without authorization or consent. The complaint was transferred to the Racine County Sheriff's Department, and McAuliffe met with a Racine County detective shortly thereafter and told the detective about Pacetti's threats. (Docket #77 at 23, #81 at 16–17). On May 27, 2014, the Racine County Sheriff's Department executed a search warrant on the City, taking, among other things, the City's email server. (Docket #77 at 24).

On May 30, 2014, Mayor Bosman, at the urging of Pacetti and the City Attorney, scheduled a meeting of the Common Council to take place June 2 "[t]o consider the service and lease agreements between the City and COMSYS, Inc." *Id.* at 25. The agenda for this special meeting of Common Council session stated that the Common Council may go into closed session to "discuss litigation strategies with the City's Legal Counsel regarding issues surrounding this action." *Id.* Similarly, on the same day, St. Peter called a meeting of the Board of Water Commissioners to take place on June 2 "[t]o consider the Management Information System Agreement, including First Amendment, by and between the City of Kenosha Water Utility, a Wisconsin Water Utility, and COMSYS, Inc., a Wisconsin Corporation." *Id.* The agenda for the Water Commissioners meeting also

stated that the Board may go into closed session to discuss litigation strategies. *Id.*

Late in the day on May 30, 2014, McAuliffe received emails from Pacetti and St. Peter informing her that Comsys access to all City and Water Utility computer systems had been temporarily disabled because, according to St. Peter in his deposition, McAuliffe was "putting the city in a bad light" by "[s]aying that there were illegal things going on, inappropriate things going on." *Id.* at 26.

On June 2, 2014, prior to the special meetings of the Common Council and Board of Water Commissioners, McAuliffe emailed all Alderpersons with (1) a copy of a letter sent by Comsys' attorney to the City Attorney outlining Kerkman's and Pacetti's dubious conduct over the prior year, (2) a copy of the job posting for the City's Director of IT position, and (3) a full copy of Miskinis' investigative report. *Id.* at 26–27. Most of the Alderpersons testified that they saw and read the letter attached to McAuliffe's email prior to the meeting that day. *Id.* at 27.

At the June 2 meeting, the Common Council, along with Pacetti, St. Peter, the City Attorney, and Mayor Bosman, went into closed session. *Id.* at 28–29. When they moved back into open session, the Common Council voted to terminate the City's contract with Comsys. *Id.* at 29. After the meeting of the Common Council, the Board of Water Commissioners held its meeting, and voted to terminate the Water Utility contract with Comsys. *Id.* at 32. After the meetings, Alderman Bogdala gave interviews to news media outlets where he said that the termination of the Comsys contracts was premised upon the criminal investigation into Kerkman. *Id.* at 32–33.

On June 4, 2014, McAuliffe received a letter signed by Mayor Bosman providing notice of the City's intent to terminate its contract and a

letter signed by St. Peter providing similar notice on behalf of the Water Utility. *Id.* at 32. Both contacts would terminate a year later. *Id.* In November 2014, as part of the 2015 budget, the City and the Water Utility added a total of six IT positions, of which five were filled by former Comsys employees. *Id.* at 33.

4. ANALYSIS

   4.1 **First Amendment Retaliation**

   4.1.1 **Background**

A jaunt through history is necessary here to properly explain the state of the plaintiffs' First Amendment claim. The plaintiffs originally lodged their First Amendment claim against Bosman, Pacetti, St. Peter, the City, and the Water Utility. The plaintiffs alleged that McAuliffe (or Comsys, through the acts of McAuliffe) engaged in protected expression by: (1) participating in Miskinis' administrative investigation; (2) filing a criminal complaint against Kerkman; and (3) delivering a letter to the Common Council objecting to Pacetti's and Kerman's unlawful conduct. (Docket #31 ¶¶ 151–241, Ex. K). The defendants retaliated against them for engaging in these speech acts, they alleged, by terminating the Comsys Contracts.

In this Court's order on the defendants' first motion for summary judgment, the Court explained that speech by government employees receives limited First Amendment protection. *See Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006) ("[G]overnment offices could not function if every employment decision became a constitutional matter[.]"). Specifically, a government employee's speech is protected only when she speaks as a

citizen, as opposed to as an employee, and her speech is on "a matter of public concern." *Graber v. Clarke*, 763 F.3d 888, 895 (7th Cir. 2014).³

To succeed on a First Amendment retaliation claim, a plaintiff must establish that (1) her speech was constitutionally protected (meaning, in this case, she spoke as a private citizen on a matter of public concern), (2) she suffered an adverse employment action as a result of her protected speech that was sufficiently adverse so as to deter the exercise of the free speech, and (3) her speech was a "substantial" or "motivating" factor for the adverse employment action. *Graber*, 763 F.3d at 894–95.

The Court conducted this analysis as to each of the three distinct speech acts that plaintiffs allege led to termination of the Comsys Contracts. The primary focus of this Court's analysis was on the first element: whether the plaintiffs' speech was protected or not. As to each of the alleged speech acts, the Court found that McAuliffe acted as a private citizen, as opposed to an employee, and that she spoke on matters of public concern. The Court also determined that the plaintiffs' interest in delivering their message of public concern outweighed the government's interest in controlling their speech to maintain the efficiency of its operations. Therefore, the Court found that each of the speech acts satisfied the first element of a First Amendment retaliation claim. The Court then found the second element, an adverse employment action, was satisfied, and that the third element, causation, presented a jury question.

---

³The Court applied this principle to Comsys as independent government contractor, relying on *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 675 (1996). (Docket #114 at 15). In its order on the interlocutory appeal in this case, the Seventh Circuit did the same. (Docket #132 at 4–5).

Finally, the Court considered whether Bosman, Pacetti, or St. Peter were entitled to qualified immunity as to the First Amendment claim and held in the negative. In its interlocutory appeal order, the Seventh Circuit reversed this Court's denial of qualified immunity to those three men, thereby absolving them of liability for damages. (Docket #132 at 3–8). Therefore, the only remaining defendants facing liability for the alleged First Amendment violations are the City and the Water Utility.

### 4.1.2 Seventh Circuit's Decision on Appeal

The Seventh Circuit's decision regarding qualified immunity focuses solely on the first element of the First Amendment claim—whether the plaintiffs' speech was protected (and, then, whether the law regarding the status of that speech was clearly established). Despite the limited nature of the court's decision, it provides relevant insights about the facts and law applicable to the remaining claim in this case.

First, the Seventh Circuit found that McAuliffe's email to the Common Council is not protected speech, because McAuliffe did not send it in her capacity as a citizen speaking on a matter of public concern. Instead, the letter "spoke for Comsys as a contractor trying to keep business." (Docket #132 at 5).

That leaves McAuliffe's participation in the Miskinis investigation and her criminal complaint about Kerkman. As to these speech acts, the appellate court observed that "[t]he law does not clearly put [them] on either the protected or the unprotected side." *Id.* at 7. This necessitates a "balanc[ing of] interests (the City's interest in having an efficient IT operation versus McAuliffe's interest in protecting her business and reporting someone she believed to be a thief of her emails) to decide whether the First Amendment overrides the City's position." *Id.* In the

original summary judgment order, this Court resolved the balancing of interests in the plaintiffs' favor.

The Seventh Circuit did not opine as to the remaining elements of the plaintiffs' First Amendment claim.

### 4.1.3 *Monell* Liability for Violation of the First Amendment

With this background in mind, the Court turns back to the plaintiffs' First Amendment claim against the City and the Water Utility to determine its viability at this stage of the proceedings.

The claim against the City and Water Utility is lodged under *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978). (Docket #31 at ¶¶ 146–150, 233–241). *Monell* teaches that municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents. 436 U.S. at 691–94. Municipal liability exists only "when [the] execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id*. at 694.

There are three ways in which a municipality can violate an individual's civil rights: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal citations and quotations omitted).[4]

---

[4] The Court pauses to note that although the plaintiffs have pursued the City and Water Utility as separate defendants in this case, they are one in the same for purposes of

Plaintiffs' theory rests on the third theory of municipal liability described above. "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original). The final policymakers with respect to approval of a termination of vendor contracts for the City and Water Utility are the Common Council and the Board of Water Commissioners. *See* Wis. Stat. § 62.11(5); City of Kenosha Code of General Ordinances § 1.06H. On this point, the parties agree. *See* (Docket #135 at 7, #137 at 6).

In the instant motion, the defendants argue that the *Monell* claim must be dismissed for several reasons. The first is non-starter. The defendants open their briefing by arguing, mistakenly, that the *Monell* claim must fail because all of the individual defendants have now been dismissed from the case (having been immunized). While it is true that *Monell* liability cannot lie where the plaintiff fails to prove a violation of her constitutional rights in her underlying claims against the individual defendants, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), a grant of immunity does not equate to a failure to prove an underlying constitutional violation. *See Matthews v. City of E. St. Louis*, 675 F.3d 703, 709 (noting that a city can be held liability even if its officers are acquitted on the defense of good faith because "there is still an argument that the city's policies caused the harm, though the officer was acting in good faith."). Therefore, the immunization of the City employees and alderpersons in this case does not foreclose *Monell* liability against the City itself.

---

*Monell* liability. If either the City's Common Council or the Water Utility's Board of Water Commissioners, as final policymakers, violated the plaintiffs' First Amendment rights, *Monell* allows the plaintiffs to collect from the municipality itself—the City.

In their reply brief, the defendants try another argument founded on mistaken principles. They argue, as if it were dispositive, that "[w]hile Plaintiffs have identified a final policymaker in the City/KWU, they have not identified a 'policy' that violates First Amendment rights." (Docket #139 at 2). All the plaintiffs have shown, the defendants say, is that the City and Water Utility, through their final policymakers, voted to terminate the Comsys Contracts. *Id.* at 3. This is a one-off vendor decision, not promulgation of a policy, which the defendants apparently believe is a necessary component of a "final policymaker" *Monell* claim.

Because it is raised for the first time in their reply brief, this argument is waived. *United States v. Kennedy*, 726 F.3d 968, 974, n.3 (7th Cir. 2013). Waiver aside, the argument also fails on its merits. The Supreme Court rejected it long ago in *Pembaur*, holding that "it is plain that municipal liability may be imposed for a single decision by municipal policy-makers under appropriate circumstances." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986). The Court explained:

> To be sure, "official policy" often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.... However, as in *Owen* [*v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ] and *Newport* [*v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)], a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decision-makers, it surely

> represents an act of official government "policy" as that term is commonly understood. *More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether the action is to be taken only once or to be taken repeatedly.* To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Id.* 475 U.S. at 480–81 (footnote omitted) (emphasis added); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("In the years since *Monell*, the Court has considered several cases involving isolated acts by government officials and employees. We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.") (citations omitted). Therefore, the defendants' contention that the City's termination of the Comsys Contracts was an isolated contractual decision, not a policy, does not save the City from liability.[5]

Finally, the defendants argue that the *Monell* claim should be dismissed because the Seventh Circuit held that McAuliffe "was acting as a public employee and speaking on public matters at the time." (Docket #135 at 9). The "time" to which defendants refer is when she sent an email to the Common Council apprising them of Kerkman's and Pacetti's alleged misconduct. Indeed, as noted earlier, the Seventh Circuit found that McAuliffe's June 2 email to the Common Council was not protected speech because she sent it in her capacity as a government employee trying to protect her job. On this point, therefore, the Court agrees with the

---

[5]Without a doubt, the defendants actually know this to be true; they cited *Pembaur* for this very principle in their opening brief. (Docket #135 at 8).

defendants. McAuliffe's act of sending an email to the Common Council to complain about colleagues' misconduct cannot, in this case, form the basis of her First Amendment claim.

But she has also put forward evidence that her company's contracts were terminated because of two other speech acts. The defendants say nothing (in their opening brief) about the other two. In reply, they argue that only the June 2 email could possibly be relevant to the City's and Water Utility's liability because the alderpersons had no knowledge of the other speech acts until they received the email. (Docket #139 at 7–8).

As with their other argument made for the first time in their reply brief, this one is waived. *Kennedy*, 726 F.3d at 974, n.3. And again, waiver aside, the argument fails. This Court concluded in its first summary judgment order that McAuliffe's participation in the Miskinis investigation and her filing of a criminal complaint both amounted to protected speech. Nothing in the Seventh Circuit's interlocutory appeal decision changed that conclusion. Therefore, the relevant inquiry is whether the plaintiffs have created a jury question as to the other two elements of their *prima facie* claim against the City and Water Utility—that the plaintiffs suffered an adverse employment action (which the defendants have never meaningfully contested, apart from conflating this element with causation) and that the plaintiffs' protected speech acts caused the City and Water Utility to terminate the contracts.[6]

---

[6]In addition to the *prima facie* elements discussed herein, there are other showings required to ultimately prove the First Amendment claim. Once the plaintiffs make their *prima facie* case, the burden of proof shifts to the defendants "to demonstrate that [they] would have taken the same action in the absence of the protected speech." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009). If the defendants carry this burden, the plaintiffs must then show that the

Even without the June 2 email, the third element rests on a morass of disputed facts. A reasonable jury could find, as the plaintiffs would like, that the alderpersons learned about the plaintiffs' participation in the investigation and criminal complaint (the protected speech acts), decided McAuliffe's complaints about her colleagues were giving the City a bad name, and voted to end the Comsys contracts to shut her up. On the other hand, this scenario may seem too attenuated for the jury to believe. They may find that something else, such as performance issues or the administrative efficiency of bringing IT in-house, motivated the City's and Water Utility's decision.

As the Court noted in its first summary judgment order, the persuasiveness of an employer's non-retaliatory explanation for discharging an employee ordinarily is for the finder of fact to assess, and in light of the fact issues underlying this element of the claim, the Court will not grant judgment in the defendants' favor at this stage. *See Massey v. Johnson*, 457 F.3d 711, 719 (7th Cir. 2006) (in a First Amendment retaliation claim, summary judgment should be granted only when the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case as to its motivation for taking adverse employment action).

5. **CONCLUSION**

In light of the foregoing, the defendants' second motion for summary judgment will be granted insofar as the plaintiffs' Fourth Amendment claim (Counts One and Two) will be dismissed. The motion

---

defendants' reasons for taking the employment action were pretextual. *Id.* Because disputed facts underlie the plaintiffs' *prima facie* case, and because the parties did not brief these issues, the Court does not delve into them.

will be denied in all other respects. In light of the Seventh Circuit's mandate, defendants Pacetti, St. Peter, and Bosman will be dismissed from this case. Finally, an amended trial scheduling order will follow, setting a date for a trial on the remaining First Amendment, breach of contract, and tortious inference claims.

Accordingly,

**IT IS ORDERED** that the defendants' second motion for summary judgment (Docket #134) be and the same is hereby **GRANTED in part and DENIED in part** as reflected in this Order;

**IT IS FURTHER ORDERED** that Counts One and Two of the Amended Complaint (Docket #31 at 45–49) be and the same are hereby **DISMISSED**; and

**IT IS FURTHER ORDERED** that defendants Frank Pacetti, Edward St. Peter, and Keith G. Bosman be and the same are hereby **DISMISSED.**

Dated at Milwaukee, Wisconsin, this 29th day of August, 2019.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge